919 A.2d 826

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. ROBERT A. FIGUEROA, DEFENDANT–RESPONDENT.

Argued January 30, 2007—Decided April 26, 2007.

*Sara B. Liebman,* Assistant Prosecutor, argued the cause for appellant (*Theodore J. Romankow,* Union County Prosecutor, attorney; *Steven J. Kaflowitz,* Assistant Prosecutor, of counsel and on the brief).

*Anthony J. Pope, Jr.,* argued the cause for respondent.

Justice HOENS delivered the opinion of the Court.

In 1980, we announced guidelines to govern trial courts faced with the questions of whether and how to direct juries that had reported themselves to be deadlocked to continue their deliberations. *State v. Czachor,* 82 *N.J.* 392, 413 *A.*2d 593 (1980). In particular, we concluded that the charge then generally utilized was inherently coercive, and we directed trial courts to use instead an alternate form of the charge that would avoid pressuring dissenting jurors into surrendering their "honest convictions" about guilt or innocence merely to reach a unanimous verdict. *Id.* at 405 n. 4, 413 *A.*2d 593. The concerns that supported that decision motivated us to direct that our model charges be revised to include a general charge that would advise jurors of their obligations to consult and deliberate with each other and would authorize them to re-examine and change their own views when appropriate, but which would also remind them not to reach an agreement that would do "violence to individual judgment." *Ibid.* At the same time, we approved the use of a portion of that modified charge in response to a jury's report of a deadlock. We left whether, in an individual trial, that charge could be given or repeated to the discretion of the trial court.

The question presented in this case is whether a supplemental charge to the jury reporting a deadlock that did not repeat those admonitions, and that suggested that deliberations would continue until unanimity was achieved, constitutes reversible error. Because we have concluded that the language used by the trial court, which was not tempered by any repetition of the language of the modified, supplemental charge, had the effect of coercing the dissenting juror or jurors into agreeing with the verdict announced shortly thereafter, we direct that defendant be afforded a new trial.

I.

A.

We begin our analysis with a recitation of the testimony and

evidence presented during the trial.[1]  Samir Pretlow and two of his friends, Phillip Austin and Willie Davis, went to a bar in Elizabeth one evening in February 2003.  At some point during that night or in the early morning hours of the next day, they encountered defendant Robert Figueroa and his friend, co-defendant Jeffrey Colon, at the bar.  According to Davis, defendant and Pretlow bumped each other and then engaged in "a couple [of] stare-downs."  Defendant asked Pretlow why he was "looking at [defendant] funny" and Pretlow offered to "go outside" about it. Defendant, Colon, Pretlow, Austin, and Davis all went outside and, as the group walked from the bar, defendant and Pretlow began a heated argument.  Davis and Colon walked away from the other three, engaging in a conversation of their own.  As they were returning to the group, Davis saw Colon walk to his nearby parked car, described as a gray Intrepid, and he heard defendant threaten to "body" one of the others to "show [them] it's not a game."  Davis testified that he and the others understood this to be a threat by defendant to kill someone.

According to Davis, Colon then handed a gun to defendant who pressed it to Pretlow's head.  In response, Pretlow began to struggle with defendant for control of the gun and punched defendant three times in the face while doing so.  Colon attempted to break the two apart, while Davis and Austin urged Pretlow to leave because they were unarmed.  After defendant and Pretlow were separated, defendant raised the gun, pointing it at Davis. As Davis ran up the street, he heard shots being fired.

Austin was hit once in the left leg and fell to the ground. Forensic evidence produced at trial demonstrated that Pretlow was hit three times in the leg and once in the chest.  He died the next day at the hospital.

---

[1] Although the specific facts relating to the events and the investigation do not bear directly on our analysis, this summary illustrates that the jury was faced with significant issues of credibility.

At the sound of the gunfire, Jose Banos, a resident of a nearby building, awoke. He thought that someone had thrown a rock at a car window, but his wife told him that she thought it was the sound of gunshots being fired. Banos looked out of his window and saw a tall thin man and a shorter man, noting that the thin one had a black object in his hand. He testified that he heard the sound that had awakened him again after he had finished looking out of the window.

Two Elizabeth police officers responded to a call of shots being fired. They left after dispersing a crowd that was watching an unrelated argument between two women, but returned a few minutes later when they were alerted by two other police officers that Pretlow and Austin had arrived at a nearby hospital with gunshot wounds. Near the scene they found a Cleveland Indians baseball cap, which they later learned matched the shirt Pretlow had been wearing. In addition, the officers noticed that there was a bullet hole and a shattered rear window in a parked Hyundai that they discovered belonged to Banos, and they found three spent shell casings near the car. They also found a wristwatch, a blue Polo headband and a fourth shell casing between the Hyundai and another parked car. Two "projectiles" were later found lodged inside of the Hyundai.[2]

The two other police officers who had gone to the hospital were not able to interview Pretlow, because he was undergoing surgery from which he never regained consciousness. They attempted to interview Austin, who was not cooperative. He gave the officers five different false names before they learned his identity from a family member at the hospital. When Austin spoke with the officers, he first told them that the argument at the bar had been between two women and that he and Pretlow were hit by bullets when shots were fired as part of that fight. He told the officers

---

[2] Expert testimony demonstrated that the shell casings had all been fired from a single automatic gun. Because the gun was not recovered, the expert was unable to testify that the projectiles were also fired by that weapon.

that he was unable to identify the shooter, telling them that he did not know the shooter and thought that the people involved were from out of town. Austin was released from the hospital later that day.

The next day, Austin walked into the Elizabeth Police Station and told the desk officer that he had information about the Pretlow shooting. He then voluntarily gave Detective Ismael Olivero a statement about the incident. His statement was typed, reviewed by him, and signed. In it, he explained that there had been "a tussle" and that Colon had given defendant the gun that defendant then used to shoot him and Pretlow. Thereafter, Austin again changed his story, telling an investigator retained by defendant in a taped interview that he only knew that defendant and Pretlow had words in the bar and left together. Austin told the defense investigator that he had merely assumed defendant was the shooter when he heard the shots being fired. At trial, Austin testified that he could only recall "a little commotion" among "females" prior to being shot as he was running away. In addition to Austin's trial testimony, both the typed statement he gave to the police and the taped statement he gave to defendant's investigator were admitted into evidence.

Davis, who had also been with Pretlow at the bar, gave conflicting information to police and defense investigators as well. Davis first appeared, voluntarily, at police headquarters and told the police that he had information about the shooting. In his statement, Davis identified defendant as the shooter and revealed that Davis had seen Colon retrieve the gun from his car and hand it to defendant. Prior to trial, however, Davis gave a written statement to an investigator for defendant. That consisted of a single, handwritten sentence in which he stated that he had not seen anything at all on the date of the shooting. At trial, after Davis had given testimony consistent with his first statement to the police, he disavowed the written statement he had given to the defense investigator. He explained that he signed that statement because he was approached on the street by defendant's investiga-

tor, without warning, outside of a family member's house in another city. Davis testified that he wrote the statement for defendant's investigator because he was afraid of defendant and of what he would do if he testified against defendant.

Both Austin and Davis were cross-examined on the inconsistencies between their testimony and their statements to the police and to defendant's investigator. In addition, each was confronted with his criminal convictions and examined on their membership, along with Pretlow, in a street gang. Defendant's investigator, David Foster, who had interviewed Davis and Austin, and to whom each had given his conflicting statement, also testified. As to Davis, Foster denied that he approached him without warning in the street and testified that Davis had reached out for him and volunteered his recantation. In addition, Foster testified that he spoke several times with Austin before taping his statement. According to Foster, Austin told him "he was feeling guilty that he said the wrong thing to the Prosecutor." Co-defendant Colon called Joseph Rolo, an auto body shop manager, to testify that Colon's car, the gray Intrepid, was in his shop for repairs from February 10 until February 24. Colon therefore contended that Davis's testimony to the effect that Colon had retrieved a gun from his car and had handed it to defendant could not be correct.

## B.

Defendant and co-defendant Colon were indicted for first-degree murder (of Pretlow), *N.J.S.A.* 2C:11–3a(1), (2), *N.J.S.A.* 2C:2–6; first-degree attempted murder (of Austin), *N.J.S.A.* 2C:11–3a, 2C:5–1; second-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4a; and third-degree unlawful possession of a handgun, *N.J.S.A.* 2C:39–5c. In a separate indictment, they were also charged with second-degree certain persons not to have weapons, *N.J.S.A.* 2C:39–7b. Defendant and Colon were tried together in a trial that commenced on October 19, 2004, and included three full days of testimony.

The jury began deliberations at 2:45 p.m. on Tuesday, October 26, 2004. The initial jury charge, consistent with our Model Charge, *see Model Jury Charges (Criminal)*, Final Charge (1994), included the following instructions:

> Now, this verdict must represent the considered judgment of each of you, and must be unanimous. It is your duty, as jurors, to consult with one another with a view towards reaching an agreement, if you can do so without any violence to your own individual judgment. Each of you must decide the case for yourselves, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations do not hesitate to reexamine your own views and/or change your opinions, if you are convinced they are erroneous, but *do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.*
>
> [ (emphasis added).]

It is not entirely clear from the record, but it appears that the jury ended its deliberations that day by 4:20 p.m. and returned to the courthouse to continue the next morning at approximately 9:00 a.m. It also appears that the jury was released for lunch from noon until 1:30 p.m., after which they again began to deliberate.

The same day, shortly before 2:25 p.m., the jury sent the court a note advising that "we cannot unanimously agree on the verdict." The trial court did not ask the jury whether further deliberations would result in a verdict. Instead, the court gave the jury the following supplemental instruction:

> I want to tell you, right now, that one day does not a deliberation make. Sometimes it takes time to go through the process.
>
> And in response to your note I just want to speak with you for a minute or two. I want to speak about the jury deliberation process to be sure that you fully understand just what is contemplated.
>
> It is a process in which you are asked to do two things. You are asked to listen to what is being said by the other jurors with a view towards accepting what you hear, and at the same time you are asked, when it's your turn to speak, to speak with a view towards persuading the others to what you are saying, and it works when jurors are able to do both. It's not that difficult to do when you realize what it is a rational deliberative process and it's a process of which you are requested, as you listen to what the others are saying, to receive that with an open mind, in other words, in a receptive frame of mind to be persuaded to what you are hearing. Then, as I say, when you speak you are also to speak with a view towards persuading the others to what you are saying.

Now, that, obviously, is an ongoing process, but functions when the jurors are only able to do both and you do that in a building block fashion, a building block fashion, if you will, where you start out with some rather basic simple facts and begin to move on from there to other facts and you talk about the evidence and then address, are we satisfied with this, that, or the other thing has been established and exists, and what you are doing is building a foundation, if you will, a factual foundation, and then when you've done that you begin to then address, what does that mean? What does this tell us? What may we properly and reasonably infer from what we've concluded are the basic facts and what is a strong rational inference or is it not? Are we persuaded we should draw that inference and only when you've gone through that, still just dealing with the facts and drawing inferences from those facts do you get, then, to the elements of the offense and ask yourselves, now, has the State established this element beyond a reasonable doubt, but all throughout that process it is both a speaking and listening deliberation and each juror is expected to listen with a view to be persuaded by what the others may be stating and what the juror hears at the time, and also speaking with a view towards persuading others as to what is to be said at the time. Through that deliberation, through that rational process you begin to go and build those blocks.

*I got to be here tomorrow, I got to be here Friday. I got nothing going on Saturday, and Giants are playing away on Sunday, so we will be here as long as it takes you to go through this process.*

I want you to continue, but I want you to do so keeping in mind what I said both now and earlier, the basic instructions that I delivered to you yesterday. I think if you focus on that process and what is being asked of you as a deliberating jury that, maybe, that will be of some assistance to you.

[ (emphasis added).]

Defendant immediately objected to this instruction, arguing that it was inappropriate because the trial court failed to remind the jurors that they should not "surrender their honest convictions" merely to return a verdict. Referring to the language used by the court as "too forceful," defendant asked the court to clarify the underscored comments by explaining to the jurors that they would not actually be held for the remainder of the week and even over the weekend if they failed to return a unanimous verdict.

The trial court declined to explain or clarify, in part because the supplemental charge generally referred back to the initial instructions which had included all of the appropriate cautionary language. Defendant then requested that the court specifically remind the jury about the relevant part of that initial instruction concerning the process of deliberations. The court, however,

refused to do so because the court did not agree that the supplemental charge was itself inappropriate.

Approximately one hour later, the jury reported that it had reached a verdict [3] on all counts. As the trial court reviewed the verdict sheet and polled the jury on each of the questions, all were unanimous in finding defendant not guilty of the murder of Pretlow but guilty of the lesser-included offense of aggravated manslaughter of Pretlow. The jury also unanimously agreed that defendant was not guilty of either attempted murder or aggravated assault of Austin. However, when polled about the other charges, the jury was not unanimous. Rather, one juror dissented from the jury's purported guilty verdicts on the charges of possession of a weapon for an unlawful purpose and unlawful possession of a weapon. The trial court told the jury that a non-unanimous vote was not a legal verdict, advised them that their verdicts on the charges other than the two weapons offenses would be accepted as final and instructed the jury to "continue ... deliberations and advise [the court] when [the jury] reached a verdict on those charges." The court did not inquire about whether additional deliberations would be fruitful and did not provide any new, supplemental, or additional instructions.

Both defendants moved for a mistrial, arguing that the jury's non-unanimous response to some of the charges demonstrated that the supplemental charge had been coercive. They reasoned that because one juror had openly expressed her dissent on the weapons offenses, her apparent agreement with the aggravated manslaughter charges must have been motivated only by pressure to avoid being held in deliberations all weekend. In denying the motion for a mistrial as to all charges, the trial court stated in part:

First of all, let me put to bed this observation by the defense, for obvious appellate purposes, that the court somehow coerced the jury by telling the jury that it was

---

[3] Because we address only the issues raised by defendant Figueroa, we will not recite any part of the jury's verdict on the charges against his co-defendant Colon.

going to be here tomorrow, Friday, Saturday, and Sunday. I think that the tenor of the comments, when taken in the totality of the circumstances up close and live with an opportunity to observe here, as opposed to the written word, was that there was no rush to judgment required here. I told them that one day does not make a deliberation and that we can be back here any of those days, and they could feel comfortable that they could continue with their deliberations and reach a decision at their leisure on any of those days. I didn't suggest that they had to come back with a verdict today.[4]

Approximately twenty minutes later, the jury returned with a unanimous verdict, finding defendant guilty of both of the unlawful gun possession charges.[5]

In mid-December 2004, defendant filed his motion for a new trial. He again argued that the supplemental charge and the court's order to the jury to continue when they returned with a non-unanimous verdict were unduly coercive and that the verdict should therefore be set aside. In denying the motion, the trial judge explained the disputed instructions:

I think what was being conveyed to the jury is that they have as much time as it needs to reach a decision in this case. It didn't have to do it that day, I was going to be here for days afterward and whatever it took for them to proceed with the process that we discussed before was fine with me. It didn't have to come back by 4 o'clock because court normally ends at 4 o'clock. In point of fact if they wanted to deliberate into the Giants game it was okay with me because we wanted the process to be a deliberative and cautious one.

In January 2005, defendant was sentenced to a term of twenty years, to which the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2, applied, on the lesser-included offense of first-degree aggravated manslaughter. The count for second-degree posses-sion of a weapon for an unlawful purpose merged for sentencing purposes, and defendant was sentenced to a concurrent five-year term for third-degree unlawful possession of weapon.

---

[4] The court then addressed, on the record, the argument raised by defendants concerning whether the jury had returned an inconsistent verdict that required relief. That aspect of the record is not germane to this discussion.

[5] Defendant consented to a bench trial at a later date on the certain persons not to have weapons charge.

In an unpublished opinion, the Appellate Division reversed defendant's conviction and remanded for a new trial. That decision was based on the panel's conclusion that the trial court's comments in the supplemental charge relating to potential weekend deliberations "tainted the process." [6] Describing the language as "impermissibly coercive," the panel found that, taken literally, the instruction suggested that the jury would be required to remain in the courthouse until a unanimous verdict was reached, even if deliberations continued through the weekend. The panel concluded that, although the court did not believe that the jury understood those remarks to mean that, the trial court "failed to appreciate the effect [the] comments might have on the jury," in light of the judge's "exalted position of authority."

The State filed a petition for certification, urging us to conclude that the suggestion to the jury that deliberations might continue through the weekend was not impermissibly coercive. We granted that petition, 188 *N.J.* 358, 907 *A.*2d 1016 (2006), and we now affirm.

## II.

The State argues that the trial court's supplemental jury instruction was not coercive. More to the point, the State asserts that the Appellate Division failed to give adequate deference to the trial court's evaluation of the impact of these comments on the jury. In short, the State urges us to conclude that the trial court's instruction did not pressure any hold-out juror to change his or her vote to reach a unanimous verdict, but rather emphasized the importance of taking enough time during the deliberative process. Read in context, the State asserts that the court's comment about weekend deliberations did not compel jurors to reach a verdict hastily, but instead assured them that ample time would be

---

[6] Defendant also sought reversal because of improper exclusion of defense testimony and prosecutorial misconduct. The Appellate Division found those arguments lacked "sufficient merit to justify discussion in a written opinion," *see* R. 2:11–3(e)(2), and we have not considered them.

provided for them to deliberate and cautioned them not to rush to judgment.

Moreover, the State argues that because the comment about the weekend was made on a Wednesday afternoon, no reasonable juror would have believed it to be a threat to force them to continue no matter how long it took. Rather, in light of the time when the comment was made, the jury would have understood, and did understand, the trial court's remark to be facetious. Finally, the State contends that the trial court's supplemental jury charge contained appropriate cautionary language because the trial court referred to all of the previously delivered instructions, which, in part, instructed jurors not to surrender their conscientiously held beliefs merely to return a verdict.

Defendant argues that the Appellate Division's judgment should be affirmed because the trial court's instruction was unduly coercive. Emphasizing the importance of jury instructions, defendant argues that even a subtle intrusion into the neutral area of jury deliberation is impermissible. Notwithstanding the trial court's belief that the instruction to the jury implicating weekend deliberations merely signaled to them a willingness to give them as much time as they needed, defendant argues that the effect of that supplemental charge prompted the dissenting juror or jurors to forgo their independent judgment, creating an unjust result.

### III.

Our modern view of supplemental charges given in the context of a report that the jury is deadlocked can be traced to 1980. In *State v. Czachor*, 82 *N.J.* 392, 413 *A.*2d 593 (1980), we addressed whether the use of a then-common supplemental instruction known as the *Allen*[7] charge, which was intended to persuade a deadlocked jury to reach unanimity, and a version of which was then included in our model charges, *see Model Jury Charges*

---

[7] *Allen v. United States*, 164 *U.S.* 492, 17 *S.Ct.* 154, 41 *L.Ed.* 528 (1896).

(*Criminal*) No. 4.190 (1978), was permissible. In concluding that it was not, we noted that the *Allen* charge, which had been the subject of increasing criticism by courts around the country and in scholarly journals,[8] was inherently coercive. *See Czachor, supra,* 82 *N.J.* at 397–98, 413 *A.*2d 593. In particular, we concluded that when balancing the legitimate concerns of the trial courts to foster efficiency and to avoid the expense and disruption that a deadlock and retrial necessarily entail against the possibility of coercion, the continued use of the *Allen* instruction could not be sustained. *See id.* at 402–03, 413 *A.*2d 593.

In part, our concern with the *Allen* charge rested on its tendency to focus on the member or members of the jury who were in the minority. *See id.* at 398–99, 413 *A.*2d 593. In reality, the *Allen* charge essentially admonished those dissenting jurors to reexamine their views in light of the contrary views of the majority. That charge inappropriately asked only those jurors to consider extraneous systemic concerns, such as the expense and delay of a retrial, and exploited the most vulnerable members of the jury by asking them, in effect, to acquiesce to the will of the majority. We concluded that in doing so, the *Allen* charge "undermine[d] the requirement that a verdict in a criminal case reflect unanimity of agreement freely arrived at by each juror." *Id.* at 399, 413 *A.*2d 593 (citing *United States v. Fioravanti,* 412 *F.*2d 407, 416–17 (3d Cir.1969)).

## A.

Our holding in *Czachor* was informed by earlier decisions of this Court concerning the tendency of any supplemental instruction to influence jury deliberations inappropriately. In particular, we quoted our earlier admonition that an instruction to a jury that focused on the expense of a new trial "has a natural tendency to interfere with the exercise of unfettered and unbiased judgment, by means of an illusory consideration or overemphasis of an extraneous factor." *Id.* at 400, 413 *A.*2d 593 (quoting *In re Stern,*

---

[8] *See Czachor, supra,* 82 *N.J.* at 397 n. 2, 399, 413 *A.*2d 593 (collecting references).

11 *N.J.* 584, 588, 95 *A*.2d 593 (1953)). We commented that "[s]uch an improper mandate to a jury touches the right to a free and untrammeled verdict which is the core of the right to trial by jury." *Ibid.* And we expressed our doubt about the validity of the view expressed in those earlier decisions that the potential coercive effect of an *Allen*-type charge might, in an appropriate case, be "overcome or 'balanced' by language to the effect that no juror 'should surrender his conscientious scruples or personal convictions' " as a part of the additional charge. *Id.* at 401, 413 *A*.2d 593 (quoting *Stern, supra,* 11 *N.J.* at 589, 95 *A*.2d 593; citing *State v. Williams,* 39 *N.J.* 471, 484, 189 *A*.2d 193, *cert. denied,* 374 *U.S.* 855, 83 *S.Ct.* 1924, 10 *L.Ed.*2d 1075 (1963)).

In *Czachor,* we concluded that "the *Allen* charge conveys both blunt and subtle pressure upon the jury, pressure which is inconsistent with jury freedom and responsibility. Such a charge does not permit jurors to deliberate objectively, freely, and with an untrammeled mind." *Id.* at 402, 413 *A*.2d 593. We therefore held that the *Allen* charge could no longer be given, and we departed from earlier decisions that suggested to the contrary. *Ibid.* In particular, we noted that the record we there reviewed demonstrated that the charge was repeated three times, each time with an inappropriate focus on the dissenting jurors and with references to the inconvenience and cost of a retrial should the jurors be unable to agree. *See id.* at 403, 413 *A*.2d 593. Moreover, we commented that in a short trial, the third use of the charge, which was given after the jury had engaged in deliberations for many hours and had reported to the court that its efforts had been sincere, but unavailing, was independently coercive. *See ibid.*

As a part of our decision in *Czachor, supra,* we also directed our trial courts to cease utilizing the then-standard New Jersey model charge, *see Model Jury Charges (Criminal ),* No. 4.190 (1978), in favor of the sample jury charge that had been suggested for this purpose by the American Bar Association (ABA), *see ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury* § 5.4, at 145–47 (Approved Draft 1968)

(*ABA Standards*). 82 *N.J.* at 407, 413 *A.*2d 593. We commented that the proposed ABA charge avoided the "particular infirmities of the conventional *Allen* charge, . . . [as well as] the deficiencies perpetuated in the [then-existing] New Jersey model charge." *Id.* at 405, 413 *A.*2d 593. We further commented that the inherently coercive effect of the charge was in part a function of the fact that it was delivered as a supplemental charge in response to a report by a jury that it was deadlocked. *Id.* at 406, 413 *A.*2d 593. We therefore concurred with the recommendation of the ABA report and directed that the full charge be given as part of the initial instructions to the jury. *Ibid.* (citing *ABA Standards, supra,* at 146).

Thereafter, our Model Criminal Charge was revised to comply with our directive. It now includes a final charge to be given in all criminal trials, which addresses the *Czachor* decision in two ways. First, the standard final charge includes a section describing the process of deliberation. *See Model Jury Charges (Criminal)*, Final Charge at 15–16 (Deliberations) (2004). Second, the final charge includes the specific admonitions to the jury that were our focus in *Czachor* as a separate charge to be given in the event that a jury is directed to continue its deliberations. *Id.* at 24 (Further Jury Deliberations) (1994). The Model Charge therefore complies with our directive by specifically including language to reduce its coercive effect, in particular when "further jury deliberations" are needed.

### B.

Our analysis of the circumstances arising from jury deadlocks in *Czachor* did not focus solely, however, on the words that could appropriately be included in a supplemental charge. Rather, we addressed as well the timing of such a charge and set forth general parameters as to when, and how often, such a supplemental charge could be given. *See Czachor, supra,* 82 *N.J.* at 406-07, 413 *A.*2d 593.

More specifically, we rejected the adoption of a *per se* rule that would limit the number of times when the newly approved instruction could be given to a deadlocked jury. *See id.* at 406, 413 *A.*2d 593. Noting that the Ninth Circuit had adopted a rule prohibiting

any repetition of the *Allen* charge as unduly coercive, *see United States v. Seawell*, 550 *F*.2d 1159, 1162–63 (9th Cir.1977), *cert. denied*, 439 *U.S.* 991, 99 *S.Ct.* 591, 58 *L.Ed*.2d 666 (1978), we concluded instead that "[w]here the *Allen* charge itself has been modified to eliminate its coercive features, it would not appear necessary or desirable to supplant judicial discretion in favor of an inflexible *per se* rule with respect to its repeated use." *Id.* at 406–07, 413 *A*.2d 593 (citing *United States v. Fossler*, 597 *F*.2d 478, 485 (5th Cir.1979); *United States v. Robinson*, 560 *F*.2d 507, 517 (2d Cir.1977) (en banc), *cert. denied*, 435 *U.S.* 905, 98 *S.Ct.* 1451, 55 *L.Ed*.2d 496 (1978); *Seawell, supra*, 550 *F*.2d at 1166 (Wright, J., dissenting); *cf. Britt v. State*, 402 *A*.2d 808, 810 (Del.1979) ("the giving of multiple '*Allen*' charges is to be avoided and may constitute reversible error")).

We therefore left it to the sound discretion of the trial court to decide whether repeating the charge is appropriate when a jury reports that it is unable to agree. *See Czachor, supra*, 82 *N.J.* at 407, 413 *A*.2d 593. In that same context, we noted that the *ABA Standards* "indicate that if the jury has reported a definite deadlock after a reasonable period of deliberations, it would be improper to give or repeat the instruction." *Ibid.* We cautioned trial courts faced with deciding whether to give or repeat the charge to consider "such factors as the length and complexity of [the] trial and the quality and duration of the jury's deliberations." *Ibid.*

## C.

In the quarter-century that has elapsed since *Czachor*, we have revisited its meaning and rationale infrequently. Many of our post-*Czachor* decisions have involved an analysis of considerations relating to penalty-phase juries in capital cases. There, the questions about the propriety of giving any further charge are heightened because of the statutory option for a non-unanimous verdict. *N.J.S.A.* 2C:11–3f; *see State v. Brown*, 138 *N.J.* 481, 513, 651 *A*.2d 19 (1994) (describing history and significance of statute).

As a result, much of our more recent jurisprudence has focused on the questions of whether a jury reporting a deadlock or an inability to come to a unanimous decision has, nonetheless, reached a legal verdict. *See State v. Hightower,* 146 *N.J.* 239, 258, 680 *A.*2d 649 (1996) (considering meaning of deadlock in capital context).

That analysis, in turn, is informed by considerations about whether, in light of the length of the trial and complexity of the proofs, the jury has spent enough time deliberating that the reported inability to achieve unanimity was in fact a report that the jury had reached a non-unanimous verdict. *See State v. Ramseur,* 106 *N.J.* 123, 300–05, 524 *A.*2d 188 (1987), *cert. denied,* 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L.Ed.*2d 653 (1993). Under those circumstances, any further direction that the deliberations continue, particularly in the absence of a reminder of the right to return a non-unanimous verdict, could be coercive. *See State v. Hunt,* 115 *N.J.* 330, 382–85, 558 *A.*2d 1259 (1989). Nevertheless, we have not interfered with a capital verdict reached unanimously following a supplemental charge given to a jury that reported it was deeply divided, because of the language used in that charge and because the deliberations had been brief when compared to the length of the trial itself. *See State v. Harris,* 156 *N.J.* 122, 184, 716 *A.*2d 458 (1998).

Indeed, we have only rarely considered the implications of our *Czachor* decision in non-capital cases. When we have, our focus, in general, has been on limiting any kind of interference with the deliberative process, *see State v. Shomo,* 129 *N.J.* 248, 257, 609 *A.*2d 394 (1992) (disapproving acceptance of partial verdict followed by charge to continue deliberations); *State v. Corsaro,* 107 *N.J.* 339, 346, 526 *A.*2d 1046 (1987) ("deliberative process ... must be insulated from influences that could warp or undermine the jury's deliberations and its ultimate determination."), rather than on particular applications of the guidance in *Czachor* relating to jury deadlocks.

We have cautioned, however, that it is inappropriate to discharge a juror who has taken a position contrary to the other members of a jury for the purpose of substituting an alternate who might be able to create unanimity. *State v. Valenzuela,* 136 *N.J.* 458, 468–69, 643 *A.*2d 582 (1994). Rather, we have made it clear that in such circumstances, where it appears "that the jury is deadlocked [the court should] inquire of the jury whether further deliberation will likely result in a verdict." *Id.* at 469, 643 *A.*2d 582. We have directed trial courts to consider whether the "difference of opinion between members of the jury is clearly intractable," concluding that if it is, then the jury is deadlocked and a mistrial should be declared. *Ibid.* In that context, we have noted that it is not appropriate to send a dissenting juror back into deliberations "repeatedly" after a report of a deadlock. *Ibid.*

The Appellate Division, following our directives in *Czachor,* has reversed guilty verdicts reached by juries that, among other things, were never given the general admonitions of the standard final charge. *See State v. Allen,* 308 *N.J.Super.* 421, 429–30, 706 *A.*2d 220 (App.Div.1998). Nor has our appellate court hesitated to overturn guilty verdicts returned after a jury was given a supplemental charge that was coercive because the trial court attempted to "undo a jury deadlock" with a focus on "possibly the weakest links in the chain" through the imposition of a deadline and a reminder that a deadlock would necessitate a retrial. *See State v. Nelson,* 304 *N.J.Super.* 561, 564–66, 701 *A.*2d 726 (App.Div.1997) (holding that supplemental charge that directed juror, who refused to discuss facts, to deliberate was permissible, but allotting only forty-five minutes for completion of deliberations was coercive). In other circumstances, appellate panels have been similarly vigilant for evidence of coercion. *See State v. Vergilio,* 261 *N.J.Super.* 648, 655, 619 *A.*2d 671 (App.Div.1993) (instructing distraught holdout juror to continue deliberations was unduly coercive); *State v. Jones,* 214 *N.J.Super.* 68, 74, 518 *A.*2d 496 (App.Div.1986) (concluding that sua sponte additional charge on lesser-included offense offered in response to apparent deadlock was inherently coercive).

As always, the question is whether the supplemental instruction has improperly influenced the dissenting jurors to change their votes. *See State v. Marshall*, 173 *N.J.* 343, 351–52, 801 *A.*2d 1142 (2002) (citing *Ramseur, supra*, 106 *N.J.* at 313, 524 *A.*2d 188); *cf. State v. Spruill*, 28 *N.J.Super.* 381, 391, 100 *A.*2d 766 (App.Div. 1953) ("Coercion of a jury is not permissible in any degree."). In examining the propriety of the circumstances in which supplemental jury charges were given, we also have been guided by a concern for the weighty role that the judge plays in the dynamics of the courtroom. *See State v. Tyler*, 176 *N.J.* 171, 181, 821 *A.*2d 1139 (2003). One commentator has called attention to the significance on jurors of even "subtle behaviors" of a trial judge. *See* Peter David Blanck, *The Appearance of Justice: The Appearance of Justice Revisited*, 86 *J.Crim. L. & Criminology* 887, 894 (1996) ("Trial and appellate courts acknowledge that juries, witnesses, and other trial participants accord great weight and deference to even the most subtle behaviors of the judge."); Peter David Blanck, *What Empirical Research Tells Us: Studying Judges' and Juries' Behavior*, 40 *Am. U.L.Rev.* 775, 777 (1991) ("The courts, legal scholars, practitioners, and social scientists recognize that trial judges' verbal and nonverbal behavior may have important effects on trial processes and outcomes. Courts caution repeatedly that juries may accord great weight and deference to even the most subtle behaviors of the trial judge.").

As our Appellate Division has recognized, even a general inquiry by the judge about deliberations may present the possibility of coercion. In circumstances in which the trial court carefully reminded the jury that inquiries about the progress of deliberations or advice to them about usual court hours was given only in the context of keeping them informed or that reminded them that they should not feel pressured, the comments have not been found to be coercive. *See, e.g., State v. Barasch*, 372 *N.J.Super.* 355, 360–61, 858 *A.*2d 1134 (App.Div.2004) (sua sponte inquiry about progress, near the end of the court day, coupled with emphasis that no pressure to reach a verdict was intended); *State v. DiFerdinando*, 345 *N.J.Super.* 382, 396, 785 *A.*2d 440 (App.Div.

2001) (use of modified *Allen* charge advising of time when court would inquire about usefulness of further deliberations, coupled with statement that stressed that no inappropriate pressure to reach a consensus was intended), *certif. denied,* 171 *N.J.* 338, 793 *A.2d* 717 (2002). All of these considerations bear upon our evaluation not only of what the judge said, and the context in which he said it, but of how the jury understood the words and their implications.

## IV.

It is against this analytical framework that we consider the comments made by the trial court and the arguments raised by the parties. We begin by observing that the evidence was conflicting, and included testimony from two key witnesses who, at various times, had recanted and whose credibility was attacked both generally and specifically. The evidence of defendant's guilt, as the appellate panel aptly noted, was "sufficient to sustain the finding of guilt, but not overwhelming." The testimony, delivered over the course of three days, was not particularly complex, but when the jury sent its note to the court reporting that it was "unable to unanimously agree on the verdict" it had been deliberating for, at most, a single day.

We note that the jury did not confront the court with an ambiguous question that suggested but did not announce a deadlock. As the Appellate Division has held, in that circumstance, the court might simply have given a supplemental charge to the jury directing it to continue deliberating, *see State v. Childs,* 204 *N.J.Super.* 639, 646–48, 499 *A.2d* 1041 (App.Div.1985), or might have opted to answer the question presented without directing the jury to continue deliberations. *See DiFerdinando, supra,* 345 *N.J.Super.* at 392–93, 785 *A.2d* 440. Rather, the court here received a relatively benign communication that the jury believed it was unable to agree.

In light of the brevity of the deliberations, we find no error in the trial court's decision not to inquire specifically about wheth-

er further deliberations would likely result in a verdict. While we have held that "[t]he appropriate course when a juror indicates that the jury is deadlocked is to inquire of the jury whether further deliberation will likely result in a verdict," *Valenzuela, supra,* 136 *N.J.* at 469, 643 *A.2d* 582; *see State v. Hunt,* 115 *N.J.* 330, 380, 558 *A.2d* 1259 (1989), it is not always necessary for the trial court to do so, *see Vergilio, supra,* 261 *N.J.Super.* at 655, 619 *A.2d* 671. By the same token, because the jury had only been deliberating briefly, neither do we fault the trial court for deciding to require the jury to continue its deliberations.

█ Notwithstanding the foregoing, we have concluded that the supplemental charge violated the directives of *Czachor* in two fundamental respects. First, the judge erred in failing to repeat that aspect of the charge that reminded the jurors "not [to] surrender your honest conviction as to the weight or effect on the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict." *See Model Jury Charges (Criminal), supra,* Final Charge at 24 (Further Jury Deliberations). A supplemental charge that directs a jury to continue deliberating but does not remind them of their obligation in this regard poses a grave risk of being misunderstood by the jurors and therefore, of being coercive.[9]

---

[9] This particular caution has been widely relied upon as a means to ensure that a jury is not coerced when being ordered to return to the jury room for further deliberations. Some courts have even concluded that the *Allen* charge itself is not coercive when accompanied by such cautionary language. *See, e.g., United States v. Santiago,* 126 *Fed.Appx.* 21, 23 (2d Cir.2005) ("The appropriate inquiry is whether the district court instructed the jury as to the necessity on the part of each juror to adhere to his [or her] own judgment.") (quotation and citation omitted); *United States v. Martin,* 104 *Fed.Appx.* 903, 906 (4th Cir.2004) ("The most egregious mistake that can be made in the context of an *Allen* charge is for a district court to suggest, in any way, that jurors surrender their conscientious convictions."); *Campos v. Portuondo,* 193 *F.Supp.2d* 735, 747 (S.D.N.Y.2002) ("One of the touchstones that demonstrates a lack of juror coercion is the inclusion of cautionary language counseling jurors not to surrender any conscientiously held views."), *aff'd,* 320 *F.3d* 185 (2d Cir.), *cert. denied,* 540 *U.S.* 958, 124 *S.Ct.* 415, 157 *L.Ed.2d* 297 (2003); *see also* Wayne F. Foster, Annotation,

The State urges us to overlook this shortcoming in the supplemental charge, pointing out that the full charge, given only a day earlier, included that caution. The State suggests that the court's reference to the "basic instructions that [had previously been] delivered" sufficed to alert them to the appropriate standards notwithstanding the judge's failure to make use of the model charge that is designed to be used in these very circumstances. The State's argument, however, misperceives the inherently coercive effect of the language that the court used and fails to appreciate the objective evidence in the record that the jurors in fact understood the supplemental instruction to require them to continue until they reached an agreement on a verdict.

Significantly, when the jury returned shortly after the supplemental charge, and reported that it was unanimous, in fact it was not. Rather, the jury poll revealed that there was still one dissenting juror on some of the counts. In light of the complexity of the matter and the significant disputes about the credibility of the witnesses, we cannot be confident that the jury, listening to the supplemental charge, understood it in the context of the admonitions appropriately given in the earlier, complete charge.[10]

_____

*Instructions Urging Dissenting Jurors in State Criminal Case to Give Due Consideration to Opinion of Majority (Allen Charge)-Modern Cases*, 97 A.L.R.3d 96, 105–07 (2006)(collecting cases).

[10] Our dissenting colleague contends that we have utilized a "restrictive approach" in our analysis that is "forbid[den]" by two "precepts", namely, our oft-repeated caution that we consider a challenged jury charge as a whole rather than in isolation and our corollary admonition that a defendant does not have a right to have the jury charged in the precise language he desires. *Post*, 190 *N.J.* at 249, 919 *A.2d* at 844 (2007). A careful reading of the decisions our colleague has cited, however, demonstrates that in none of them did we address a challenge to a supplemental jury charge, but in each of them we instead considered only a challenge to a portion of a single charge to the jury. Notwithstanding our colleague's reliance on our general approach to analyzing jury charges, however, when we have reviewed challenges to supplemental charges, we have not considered the language to be simply a part of a larger, unified charge. Instead, we have traditionally analyzed the additional language separately from the charge it supplemented. *See, e.g., State v. Jamerson,* 153 *N.J.*

This supplemental charge was inappropriately coercive for a second reason. The reference to the possibility that deliberations might continue through the remainder of the week and into the weekend had the capacity to coerce the jury into reaching a verdict that it might not otherwise have reached. We recognize that the trial judge believed that the jurors understood him only to be saying that they would be given as much time as they needed, even if their deliberations stretched into the weekend. The court explained that the intention was simply to instruct them to be thorough and careful in their deliberations.

However, in light of the language the court chose and the context in which the comments were made, it is likely that the jury did not understand the comment about weekend deliberations in the manner in which the court intended it. While suggesting to a jury on a Wednesday that deliberations will continue through the weekend may simply convey to them that an abundant amount of time will be afforded to them to carefully weigh and analyze the evidence, the words themselves imply otherwise. Based on our review of this record, we cannot agree that the jurors were not in fact under the impression that they would be required to continue to deliberate for as long as it might take to reach unanimity. Accordingly, we conclude that taken together, the failure to utilize the model charge for further deliberations with its cautionary language and the reference to continuing to deliberate throughout

---

318, 343, 708 A.2d 1183 (1998); *Ramseur, supra*, 106 *N.J.* at 304–08, 524 A.2d 188; *State v. Harmon*, 104 *N.J.* 189, 213–17, 516 A.2d 1047 (1986). Nor do we agree with his assertion that we have failed to recognize that there is a "principle" that requires us to consider the original charge while evaluating the context and circumstances in which a supplemental charge has been given. *Post*, 190 *N.J.* at 247–48, 919 A.2d at 843 (2007). On the contrary, the decisions on which our colleague relies refer only to our usual practice of considering the circumstances which, indeed, we have done here. Moreover, unlike the record in this matter, in the vast majority of the cases relied upon by our colleague, defendant had failed to object to the charge when given, resulting in our application of a plain error analysis. *See R.* 2:10–2. These fundamental differences between the cases our colleague cites and the matter at hand compel an analysis and a conclusion contrary to the one he asserts would be correct.

the remainder of the week and through the weekend impermissibly coerced the dissenting juror or jurors into reaching a verdict with which he or she did not honestly agree.

### V.

The judgment of the Appellate Division that reversed the verdict and remanded for a new trial is affirmed.

Justice RIVERA–SOTO, dissenting.

In this case, the last words the jury heard before it began its deliberations were the following:

> Very shortly, you will retire to the jury room to commence your deliberations and apply the law that I've instructed to the facts as you determine [them] to be for the purpose [of] arriving at a fair and correct verdict. Now, this verdict must represent the considered judgment of each of you, and must be unanimous. It is your duty, as jurors, to consult with one another with a view towards reaching an agreement, if you can do so without any violence to your own individual judgment. Each of you must decide the case for yourselves, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations do not hesitate to reexamine your own views and/or change your opinions, if you are convinced they are erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.
>
> You are not partisans, you are judges, you [are] judges of the facts, and your sole interest [is] to ascertain the truth from the evidence that has been admitted.
>
> . . . .
>
> You are now in charge of the courtroom. You could deliberate as long as you want, and stop whenever you want and come back tomorrow, if you do. So we will be here for you. . . .

The jury retired to deliberate; it was 2:44 p.m. on Wednesday, October 26, 2004. The jury deliberated that afternoon and returned to its deliberations the following morning.

Less than twenty-four hours after starting its deliberations, the jury sent a note stating that it "cannot unanimously agree[ ] on the verdict." The trial court noted that "one day does not a deliberation make [because s]ometimes it takes time to go through the process." The trial court explained the deliberative process

the jury should undertake and closed with these cautionary obser-
vations:

> I want you to continue, but I want you to do so keeping in mind what I said both
> now and earlier, the basic instructions that I delivered to you yesterday. I think if
> you focus on that process and what is being asked of you as a deliberating jury
> ·that, maybe, that will be of some assistance to you.
>
> Would you please resume your deliberations. Thank you.

Counsel for defendant Robert Figueroa and his co-defendant
jointly complained that the jury instructions the trial court had
just provided were "too forceful" and requested that the jurors be
reinstructed that "you should not surrender your views, etc., etc."
The trial court demurred, explaining that

> I already told the jury in the basic charge and, which I encompassed by reference
> in the last charge, that ["]it is your duty as jurors to consult with one another [and]
> to deliberate with a view towards reaching an agreement, if you can do so without
> violence to your individual judgment. Each of you must decide the case for
> yourselves, but do so only after impartial consideration of the evidence with fellow
> jurors. In the course of your deliberations do not hesitate to reexamine your own
> views and change your opinions, if convinced they are erroneous, but do not
> surrender your honest conviction as to the weight or effect of the evidence solely
> because of the opinion of your fellow jurors or for the mere purpose of returning a
> verdict.["]
>
> . . . .
>
> And in that last charge [asking that the jury resume its deliberations,] I
> incorporate, by reference, my previous charge and tell them they must remember
> all aspects of it.

Tellingly, defense counsel specifically explained that no mistrial
was sought because "[w]e want this jury."

From this factual setting, the majority explains that it is square-
ly within "the sound discretion of the trial court to decide whether
repeating the [*Czachor*[1]] charge is appropriate when a jury re-
ports that it is unable to agree." *Ante,* 190 *N.J.* at 235, 919 *A.2d*
at 836 (2007). The majority rightly notes that, in this context,
"our focus, in general, has been on limiting any kind of interfer-
ence with the deliberative process, rather than on particular
applications of the guidance in *Czachor* relating to jury dead-
locks." *Id.* at 236, 919 *A.2d* at 836 (citations omitted). Stated

---

[1] *State v. Czachor,* 82 *N.J.* 392, 413 A.2d 593 (1980).

differently, the majority emphasizes that "the question is whether the supplemental instruction has improperly influenced the dissenting jurors to change their votes." *Id.* at 238, 919 *A.*2d at 837. The majority recognizes that "[i]n light of the brevity of the deliberations, [there is] no error in the trial court's decision not to inquire specifically about whether further deliberations would likely result in a verdict ... [and] because the jury had been deliberating only briefly, neither do[es the majority] fault the trial court for deciding to require the jury to continue its deliberations." *Id.* at 239–40, 919 *A.*2d at 838–39.

It is in the application of these principles to this case that I must part company with the majority. In the majority's view, "the supplemental charge violated the directives of *Czachor* in two fundamental respects." *Id.* at 240, 919 *A.*2d at 838. As to the former, the majority is of the view that "[a] supplemental charge that directs a jury to continue deliberating but does not remind them of their obligation [to 'not surrender your honest conviction as to the weight or effect on the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict'[2]] poses a grave risk of being misunderstood by the jurors and therefore, of being coercive." *Id.* at 240, 919 *A.*2d at 839 (footnote omitted).

In respect of the latter, the majority concludes that the jury misunderstood—and was coerced by—the trial court's following comment: "I got to be here tomorrow [Thursday], I got to be here Friday. I got nothing going on on Saturday, and [the] Giants are playing away on Sunday, so we will be here as long as it takes you to go through this process." In the majority's view, "[w]hile suggesting to a jury on a Wednesday that deliberations will continue through the weekend may simply convey to them that an abundant amount of time will be afforded to them to carefully weigh and analyze the evidence, the words themselves imply otherwise." *Id.* at 227, 242, 919 *A.*2d at 831, 840. The majority

---

2 *Model Jury Charges* (Criminal), Final Charge at 24 (1994).

"cannot agree that the jurors were not in fact under the impression that they would be required to continue to deliberate for as long as it might take to reach unanimity." *Id.* at 242, 919 *A.*2d at 840. The majority thus concludes that "taken together, the failure to utilize the model charge for further deliberations with its cautionary language and the reference to continuing to deliberate throughout the remainder of the week and through the weekend impermissibly coerced the dissenting juror or jurors into reaching a verdict with which he or she did not honestly agree." *Ibid.*

Because the majority reaches its conclusions by isolating portions of the jury charge, I disagree. In this context, our inquiry must begin and end with the core proposition that a jury charge must be examined in its entirety. We have made clear that "[i]n passing on the propriety of a trial court's charge, an appellate court reviews all that was said on the particular subject being challenged, and if on reading the charge as a whole, prejudicial error does not appear, then the verdict must stand." *State v. Ramseur,* 106 *N.J.* 123, 280, 524 *A.*2d 188 (1987) (citations and internal quotation marks omitted).

"This court has repeatedly held that portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973). *See also State v. Torres,* 183 *N.J.* 554, 564, 874 *A.*2d 1084 (2005) ("The charge must be read as a whole in determining whether there was any error."); *State v. Savage,* 172 *N.J.* 374, 387, 799 *A.*2d 477 (2002) ("A portion of a charge alleged to be erroneous, however, cannot be dealt with in isolation and should be examined as whole to determine its overall effect. The standard for assessing the soundness of a jury instruction is how and in what sense, under the evidence before them, and the circumstances of the trial, would ordinary jurors understand the instructions as a whole." (citations, quotation marks and editing marks omitted)); *State v. Delibero,* 149 *N.J.* 90, 106–07, 692 *A.*2d 981 (1997) (quoting *Wilbe-*

*ly, supra,* 63 *N.J.* at 422, 307 *A.*2d 608); *State v. Jordan,* 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997) ("In determining whether a charge was erroneous, the charge must be read as a whole." (citing *Wilbely* )); *State v. Loftin (I),* 146 *N.J.* 295, 379, 680 *A.*2d 677 (1996) ("In reviewing claims of erroneous jury instructions, the passage in question should be evaluated in the context of the charge as a whole." (citing *Wilbely* )); *State v. Marshall (I),* 123 *N.J.* 1, 145, 586 *A.*2d 85 (1991) ("[T]he prejudicial effect of an omitted instruction must be evaluated 'in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel . . . .' " (quoting *Kentucky v. Whorton,* 441 *U.S.* 786, 789, 99 *S.Ct.* 2088, 2089, 60 *L.Ed.*2d 640, 643 (1979))); *State v. Maldonado,* 137 *N.J.* 536, 579, 645 *A.*2d 1165 (1994) ("In determining the propriety of the charge, we must view the charge as a whole."); *State v. Biegenwald (II),* 106 *N.J.* 13, 43, 524 *A.*2d 130 (1987) ("Challenged portions of a jury charge must not be read in isolation; rather, 'the charge should be examined as a whole to determine its overall effect.' " (quoting *Wilbely* )); *State v. Freeman,* 64 *N.J.* 66, 69, 312 *A.*2d 143 (1973) ("In assaying the measure of success in the jury charge, we bear in mind the established principle that the reviewing court does not excise and examine in isolation those statements alleged to be obscure or ambiguous, but looks to the charge as a whole.").

The principle that a challenged jury charge is to be reviewed in the context of the entire instruction extends to a challenged supplemental charge. *Lowenfield v. Phelps,* 484 *U.S.* 231, 237, 108 *S.Ct.* 546, 550, 98 *L.Ed.*2d 568, 578 (1988) (stating that the Court "consider[s] the supplemental charge given by the trial court 'in its context and under all the circumstances' " (quoting *Jenkins v. United States,* 380 *U.S.* 445, 446, 85 *S.Ct.* 1059, 1060, 13 *L.Ed.*2d 957, 958 (1965)); *State v. Young,* 181 *N.J.Super.* 463, 472–73, 438 *A.*2d 344 (App.Div.1981) (holding that an *Allen* charge was not coercive "[u]nder all the circumstances[,]" and after reviewing "the surrounding circumstances of [the] seven week jury trial[,]" the length of the jury deliberations, and the fact that "[t]here was no repeated giving of the [*Allen* ] charge over a short period of

time"), *certif. denied,* 91 *N.J.* 222, 450 *A.*2d 549 (1982); *see also United States v. Cheramie,* 520 *F.*2d 325, 328 (5th Cir.1975) ("Where it is alleged that a supplemental charge coerced the jury in its decision-making, this court examines not only the language of the additional instruction but also the facts and circumstances which formed the context for the judge's remarks.") (citing *Jenkins v. United States, supra* )).[3]

We have also made clear that "[n]o party is entitled to have the jury charged in his or her own words; all that is necessary is that the charge as a whole be accurate." *State v. Jordan, supra,* 147 *N.J.* at 422, 688 *A.*2d 97. This must be so because "[i]t is fundamental that a trial court is not bound to instruct a jury in the language requested by a party." *State v. Thompson,* 59 *N.J.* 396, 411, 283 *A.*2d 513 (1971).

---

[3] Relying on *State v. Jamerson,* 153 *N.J.* 318, 343, 708 *A.*2d 1183 (1998), *Ramseur, supra,* 106 *N.J.* at 304–08, 524 *A.*2d 188, and *State v. Harmon,* 104 *N.J.* 189, 213–17, 516 *A.*2d 1047 (1986), the majority asserts that "when we have reviewed challenges to supplemental charges, we have not considered the language to be simply a part of larger, unified charge but have analyzed it separately from the charge it supplemented." *Ante,* at 241, n. 10, 919 *A.*2d at 839–40, n. 10. Yet, the proposition advanced by the majority—that the Court analyzes supplemental charges "separately from the charge it supplemented"—is not supported by the authority cited by the majority. For example, *Jamerson, supra,* considered a trial court's reinstruction to a jury *in the context of the trial,* finding error in light of the conclusion that the defendant was prejudiced by the improper testimony of a medical examiner. *Ramseur, supra,* began its analysis of the supplemental instruction by considering *the context* of that instruction. Rather than viewing the supplemental instruction in isolation, we noted at the outset that the trial court's failure in the supplemental charge was to specifically "remind the jury of the brief references in its main charge to the possibility and consequences of a non-unanimous verdict." *Id.* at 305, 524 *A.*2d 188. Finally, *Harmon, supra,* considered whether an answer to a jury question, which evinced its confusion as to an element of the charged offense, had the "clear capacity to mislead the jury[.]" In that case, we considered the trial court's responsive instruction based on "the circumstances[,]" which included "the conflicted evidence, the jury's admitted confusion, the dubious clarification, and the fact that the other verdicts do not resolve the factual dispute[.]" *Id.* at 217, 516 *A.*2d 1047. Simply said, the supplemental charge was not considered in isolation in any of the cases relied on by the majority.

Those precepts, in my view, forbid the restricted approach adopted by the majority. Their fair application in this case leads me to conclude that, because the trial court had—less than twenty-four hours before—charged the jury in the very words defendant claims should have been repeated here and because the trial court referenced its earlier charge in summing up the supplemental charge, I see no coercion here. Furthermore, the trial court's comments concerning how long he would be placed at the jury's disposal, including over the upcoming weekend, were innocuous when viewed in their proper context. First, the trial judge made clear that his expressions concerning being there for several days were made immediately after his explanation of precisely what we would want juries to undergo during the deliberations process. Second, the trial court explained that "we will be here as long as it takes you to go through this process" without once tilting the jury towards any verdict; again, the clearly understood focus was on the jury deliberations process, and not its result. Finally, in closing on the supplemental charge, the trial court reminded the jury that it was to continue its deliberations "keeping in mind what I said both now and earlier, the basic instructions that I delivered to you yesterday." Because I cannot conclude that the jury instructions as a whole—both the principal jury instructions and the supplemental jury instructions—were erroneous, and because I cannot find that the instructions, in whole or in part, were coercive, I cannot justify vacating this conviction and remanding the case for a new trial.

Therefore, I respectfully dissent.

*For affirmance*—Chief Justice ZAZZALI, Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*For reversal*—Justice RIVERA–SOTO—1.