# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

HAROLD LAMONT WALKER,

        Defendant-Appellant.

UNPUBLISHED
December 1, 2016

No. 327063
Wayne Circuit Court
LC No. 14-007222-01-FH

Before: FORT HOOD, P.J., and GLEICHER and O'BRIEN, JJ.

GLEICHER, J. (*dissenting*).

As the prosecutor predicted in her opening statement: this was "a pretty straightforward case."

Three Detroit police officers testified that they saw defendant Harold Walker, a convicted felon, throw a gun into some bushes. A friend of Walker's confessed to have hidden the gun in the bushes because he knew that Walker was on parole and was not supposed to be close to a weapon. After the jury had deliberated for an hour and 15 minutes, the foreperson announced that the jury was hung and declared, "I don't believe there will [be] an agreement with more time." Apparently at least one juror was not persuaded by the three officers.

Rather than reading M Crim JI 3.12, the standard instruction intended for this situation, the trial court announced that it planned to deliver its own instruction directing further deliberations and conveying that "if there's someone back there, a member of the jury, any member of the jury who's not following the instructions, they can send a note and let us know that, too." True to its word, the court proceeded to deliver a coercive instruction bearing no resemblance to the standard instruction. A rapid guilty verdict ensued. I would reverse the jury's verdict on this ground and respectfully dissent.

I

When confronted with a deadlocked jury, a trial judge should urge, but not coerce, unanimity. "The optimum instruction will generate discussion directed towards the resolution of the case but will avoid forcing a decision." *People v Sullivan*, 392 Mich 324, 334; 220 NW2d 441 (1974). Our Supreme Court has identified the two essential hallmarks of a proper charge: encouragement of a respectful discussion in which the jurors consider all views and respect for each individual juror's right to disagree. A judge should emphasize "that each juror has to make

1

an individual judgment," *id*. at 337, and that "no juror need surrender his honest convictions concerning the evidence solely for the purpose of obtaining a unanimous agreement. *People v Goldsmith*, 411 Mich 555, 559; 309 NW2d 182 (1981). " 'A calmly dispassionate balanced effort on the part of a trial judge to induce a verdict' " is unobjectionable. *Sullivan*, 392 Mich at 337, quoting *United States v Sawyers*, 423 F2d 1335, 1341-1342 (CA 4, 1970).

The instruction given here was neither dispassionate nor balanced. Rather, Judge Qiana Lillard admonished the jury as follows:

> Well, that's not the way this works. Your [sic] all heard a full day of testimony, and you deliberated for what an hour and fifteen minutes, and now you just give up. That's not the way it works, I'm sending you all to lunch, maybe what you need is some time apart and some nourishment, other than candy, to help you all, you know, have clear heads and review the evidence that you heard.

> Now, if there's someone among you who's failing to follow the instructions or there's someone who's refusing to participate in the process, you can send us a note and let us know that and we can address that, but at this point I'm not inclined to end your deliberations at this point because you had a full day of testimony and you've only been at this, discussing it, for one hour.

> So, I'm going to send you to lunch, maybe sometime apart will help you all to think about things, and then you'll come back in one hour and resume your deliberations. If you have any questions, if there is anything that you don't understand or need clarification on send a note. And again, if there's one among you or two among you, three among you who are refusing to follow instructions or participate in the process you can let us know that, too.

> Remember you are not to discuss this case, when you are anywhere other than in the jury room cause you're still a juror. So even if you go to lunch together some of you, you can not [sic] discuss this case cause you can only discuss it when you're all together and when you're in the jury room.[1]

---

[1] M Crim JI 3.12, the instruction spurned by Judge Lillard, cautiously directs:

> (1) You have returned from deliberations, indicating that you believe you cannot reach a verdict. I am going to ask you to please return to the jury room and resume your deliberations in the hope that after further discussion you will be able to reach a verdict. As you deliberate, please keep in mind the guidelines I gave you earlier.

> (2) Remember, it is your duty to consult with your fellow jurors and try to reach agreement, if you can do so without violating your own judgment. To return a verdict, you must all agree, and the verdict must represent the judgment of each of you.

One hour and 27 minutes later, the jury returned a unanimous guilty verdict.

Notably absent from the court's instruction was any cautionary language reminding the jurors that they need not abandon conscientiously held beliefs for the sake of a verdict: "[N]one of you should give up your honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement." M Crim JI 3.12(7). Nor did the trial court advise the jurors that they were obligated to listen to and "consult with" the dissenting jurors "in a spirit of fairness and frankness." M Crim JI 3.12(2), (3). In fact, Judge Lillard *never* read the proper instruction to the jury; therefore, the jurors had no opportunity to understand that conscientiously held beliefs should not be surrendered for the sake of unanimity. Instead the trial court twice threatened that it would separately "address" dissenting jurors if informed of their identities:

> [I]f there's someone among you who's failing to follow the instructions or there's someone who's refusing to participate in the process, you can send us a note and let us know that and we can address that . . . . And again, if there's one among you or two among you, three among you who are refusing to follow instructions or participate in the process you can let us know that, too.

A reasonable juror hearing this instruction would believe that his or her obligation included publicly "ratting out" any fellow jurors who disagreed with the majority's view of the case. Similarly, the dissenting juror would likely understand that justice required a verdict at the expense of that juror's conscientiously held beliefs, and that persistence was likely to result in public shaming. Apparently the trial court lost sight of the fact that the juror or jurors causing the gridlock were doing exactly what they were supposed to do. The model instructions inform jurors that it is *their* job to decide the facts of the case (not the court's) and to determine "which witnesses you believe and how important you think their testimony is." M Crim JI 3.6(1).

---

(3) As you deliberate, you should carefully and seriously consider the views of your fellow jurors. Talk things over in a spirit of fairness and frankness.

(4) Naturally, there will be differences of opinion. You should each not only express your opinion but also give the facts and the reasons on which you base it. By reasoning the matter out, jurors can often reach agreement.

(5) If you think it would be helpful, you may submit to the bailiff a written list of the issues that are dividing or confusing you. It will then be submitted to me. I will attempt to clarify or amplify the instructions in order to assist you in your further deliberations.

(6) When you continue your deliberations, do not hesitate to rethink your own views and change your opinion if you decide it was wrong.

(7) However, none of you should give up your honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement.

3

Despite that three police officers testified to having seen Walker throw the gun in the bushes, a juror had every right to doubt the veracity of this evidence.

The Supreme Court of New Jersey has determined that a supplemental charge lacking a reminder that jurors need not surrender their "honest conviction[s] . . . for the mere purpose of returning a verdict" requires reversal. The Court further observed, "A supplemental charge that directs a jury to continue deliberating but does not remind them of their obligation in this regard poses a grave risk of being misunderstood by the jurors and therefore, of being coercive." *State v Figueroa*, 190 NJ 219, 240; 919 A2d 826 (2007). "This particular caution has been widely relied upon as a means to ensure that a jury is not coerced when being ordered to return to the jury room for further deliberations." *Id*. at 240 n 9.

Michigan law is entirely consistent with *Figueroa*. In *People v Hardin*, 421 Mich 296, 316; 365 NW2d 101 (1984), the Supreme Court emphasized: "If the instruction given 'can cause a juror to abandon his conscientious dissent and defer to the majority solely for the sake of reaching agreement,' then that charge should not be used." (Citation omitted.) The only instruction the deadlocked jurors in this case received was fundamentally flawed. It stressed the need for a verdict and omitted mention that a juror has a right to maintain his or her good-faith belief. This substantial departure from the approved instruction mandates reversal of Walker's conviction.

The majority reasons that "when reviewed in context," the trial court's comments "were not as coercive as defendant claims." I am at a loss to understand the "context" to which the majority refers. Fuller review of the backdrop supplied by the transcript reflects that a coercive and despotic atmosphere likely persuaded dissenting jurors to abandon their principles.

The first day of testimony started late because a juror had failed to appear. When the juror showed up at 10:05 a.m., the trial court explained that it seated him in "the prisoner box for the duration of the proceedings."[2] This rather punitive performance was accompanied by two demonstrations of Judge Lillard's short temper and her inattentiveness. When counsel for both sides indicated that they had a stipulation to put on the record, the court instructed them to "[h]old on," as "I think I'm about to get a new iPhone 6." The record doesn't reveal whether the trial court was using her old phone or her computer when she made this remark; either way, Judge Lillard conveyed to the jury that her new iPhone was more important than the trial taking place in her courtroom.

Judge Lillard's inattention to the proceedings next resulted in a ruling that frustrated defense counsel's cross-examination. The police officers' testimonies agreed that they had stopped near a sidewalk to investigate a group of people listening to loud music and drinking alcohol. According to Officer Frank Marek, defendant Walker "quickly walk[ed]" to the porch of a nearby house and threw a gun in the bushes. Officer Michael Jackson similarly testified that Walker had "briskly walked toward the house." In contrast, Sergeant Matthew Gnatek testified that he saw Walker "run" toward the house. The prosecutor solidified this testimony as follows:

---

[2] The juror claimed he had a flat tire on the way to court. He was excused from jury service after Judge Lillard chastised him outside the presence of the rest of the jurors.

*Q.* . . . You described the defendant as running; is that correct?

*A.* Yes.

*Q.* Okay, what type of -- what pace was he running at?

*A.* Fast.

*Q.* Okay. Was it a sprint?

*A.* I would say a sprint, yes.

When defense counsel attempted to highlight the inconsistency of the officers' testimonies, Judge Lillard—who had not been listening—shot her down:

*Q.* And you observed my client, sprint away from the group up to the porch?

*THE COURT.* That's a mischaracterization, he never said he sprint [sic], never.

*DEFENSE COUNSEL.* He said fast sprint, Judge.

*THE COURT.* No, he didn't. He said run, he didn't say sprint.

*DEFENSE COUNSEL.* Okay, your Honor, that was -- I heard sprint.

*THE COURT.* Well, I can't -- well, we're not gonna argue. I have ruled.

Granted, these brief episodes of judicial malfeasance did not determine the outcome of the trial. But in my view, the trial court demonstrated quite plainly that it would brook no dissent, would not hesitate to humiliate those who broke its rules, and cared more about herself than the case before her. This backdrop heightens the significance of the improperly coercive instruction. Given the climate of Judge Lillard's courtroom, a dissenting juror needed no weatherman to know which way the winds blew—if identified as the source of disunity, the juror risked the wrath of a vengeful judge.

II

I also respectfully disagree with the majority's conclusion that the trial court properly scored Offense Variable (OV) 19 at 10 points.

OV 19 directs a trial court to assess 10 points if "[t]he offender otherwise interfered with or attempted to interfere with the administration of justice." MCL 777.49(c). The majority holds that Judge Lillard's "scoring of OV 19 was based on the evidence that Williams, the only witness corroborating defendant's defense, likely lied on behalf of defendant." Judge Lillard explained:

I think he conspired with Mr. Williams, while Mr. Williams was in custody in the Wayne County Jail awaiting trial, and they trumped up that phony,

5

bogus testimony. I don't think it's a coincidence that low-and-behold after that young man spent some time in the Wayne County Jail, all of a sudden he decided he wanted to come to court and tell a ridiculous version of events. And I think that that was nothing more than a conspiracy between Mr. Walker and -- using his influence over a young man from the neighborhood, who looked up to him, to try to get him to take the rap for him.

Contrary to the majority, there is no "evidence" that supports Judge Lillard's theory. Judge Lillard scored OV 19 based on her own speculation and conjecture, and not on fact.

In *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), the Supreme Court instructed that:

> Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo.

No evidence of record supports that Walker and Williams even spoke with each other while they were separately lodged in the Wayne County Jail. The trial court's inference of perjury based on propinquity does not equate to an evidentiary preponderance. I would hold that the trial court's hunch that Walker suborned Williams to commit perjury does not justify an assessment of points under OV 19.

### III

Finally, I believe that Judge Lillard must be disqualified from participating in any further proceedings in this case. Her behavior during Walker's sentencing hearing, quoted below, displays intemperance and bias mandating a new sentencing hearing before a different judge.

The sentencing hearing commenced with a discussion of Walker's guidelines score. After Judge Lillard ruled that OV 19 would be scored at 10 points, counsel agreed that as to his convictions for felon-in-possession and carrying a concealed weapon, Walker's minimum sentence range was 10 to 46 months.[3] The prosecutor asked for a minimum sentence of 20 months' imprisonment. Defense counsel asked for probation. The court allowed Walker to allocute. Walker complained that he was an "innocent man," that the police had lied, and that "I'd never seen that gun." The judge expressed disbelief in Walker's protestations of innocence. The colloquy continued:

> *The Court*. Well, I'm sorry you feel that way, but the Court of Appeals will review everything that was done in this case --
>
> *Defendant*. Ain't no question, I'll be back --

---

[3] Walker's third-offense felony-firearm conviction required a 10-year mandatory sentence.

*The Court.* Hold on, I'm talking now, cause I didn't interrupt you when you talked, I let [sic] say whatever you wanted to say, and when you interrupted me the first time, I didn't say anything because I understand that you were very upset. You believe that you had been wrongfully convicted, and that you have been treated unfairly, and that's emotion. And I can understand, if I was faced with something that I was convicted of that I didn't do, I would be upset too.

So, I understand why you cut me off the first time, but you're not going to keep disrespecting me; do you understand that, Mr. Walker?

*Defendant.* I been disrespected, what about me?

*The Court.* Oh, all right.

*Defendant.* I deserve respect too, right?

*The Court.* So, I disrespected you?

*Defendant.* Ain't no question, the whole court, the whole court disrespected me.

*The Court.* When, please tell me when I disrespected you, Mr. Walker?

*Defendant.* The whole court system disrespected me.

*The Court.* I want you to make sure that you outline it all for appellant [sic] review, all the times that I've disrespected you, please.

*Defendant.* Okay, you want me to tell you one?

*The Court.* Please.

*Defendant.* All right. Like, when the prosecution or the prosecution witness was up there, he said I was ran pass and I sprinted, you deliberately said that he didn't say that, and that's definitely what he said.

*The Court.* Okay, what [sic] the next time I disrespected you?

*Defendant.* It was almost like you -- you was just working with the prosecution, you never gave me a chance.

*The Court.* Okay, when is the other time?

*Defendant.* It's numerous of [sic] times, I don't even wanna talk about it. Do what you goin' [sic] do.

*The Court.* Please, tell them all, you need it on the record for your appeal.

*Defendant.* I don't need it on the record, I'll be back.

7

*The Court*.  What's that supposed to mean?

*Defendant*.  I'll be back.

*The Court*.  Be back in prison?

*Defendant*.  No, I'll be back here.

*The Court*.  That's where you'd like to go, prison.

*Defendant*.  I'll be back here.

*The Court*.  Cause that's what your life shows me, that you like to go to prison.

*Defendant*.  Man, whatever, I'm thew [sic] talking, do what you goin' [sic] do.

*The Court*.  You think you can tell me what to do --

*Defendant*.  Do what you goin' do.

You telling me what to do, I'm grown.

*The Court*.  We can stay here all day, you realize that?

*Defendant*.  I'm grown.  I'm grown, I don't talk.

*The Court*.  Do you realize that?  You don't talk what is that a threat?

*Defendant*.  I'm thew [sic] talking.

*The Court*.  Is that a threat, clown?

*Defendant*.  I'm thew [sic] talking.

*The Court*.  Is that a threat, clown?

*Defendant*.  Clown.

*The Court*.  That's what you acting like.

*Defendant*.  Okay.

*The Court*.  That's what you're acting like, a clown.

I have done nothing, but be courteous to you.  When they suggested that you might have some history of mental illness, I made sure that you went and got your evaluation.  When your lawyer was sick, and she was willing to try your

case, even though she was sick, and vomiting, and asking for a basket so that she could throw up. I said that wouldn't be fair to you --

*Defendant.* How about when you threatened my mother?

*The Court.* -- to have a lawyer --

I'm talking now. I'm talking now, clown.

*Defendant.* You threatened my mother, how about that?

*The Court.* Ain't nobody threatened your mother.

*Defendant.* Yes, you did.

*The Court.* You know what --

*Defendant.* Yes, you did.

*The Court.* -- when your lawyer was sick and vomiting and wanted to try your case, so it wouldn't be delayed. I said that wouldn't be fair to you, and I adjourned the trial so that she could be healthy enough to advocate for you.

When she needed to try to meet with the witness, in advance, to try to prepare for your case, I tried to arrange for her to be able to interview him via video, so that she could prepare her testimony -- his testimony with him in advance.

I've done nothing but be fair to you, but you know what cowards do, when cowards don't want to accept responsibility for their own foolish behavior, they make threats, they try to act like they're tough, and they wanna [sic] shift the blame. And that's what you did and, you know, I'm [sic] don't blame you, *but that's why you're getting the maximum time because you acted like a clown today.*

I was inclined to give you the middle of the road, which is what [the prosecutor] was asking for, *but because you're so disrespectful* and you just seem to want to go back to prison --

*Defendant.* I don't care what you give me --

*The Court.* Especially, considering you continue to make --

*Defendant.* I don't care what you give me, do what you do --

*The Court.* -- threats on the records --

*Defendant.* Do what you do, I don't care what you give me.

*The Court.* -- that you'll be back here, and --

9

*Defendant.*  I will be back.

*The Court.*  -- you'll see me and all those other kinda [sic] foolishness --

*Defendant.*  I will be back in court, appeal.

*The Court.*  You don't scare me.

*Defendant.*  You don't scare me.

*The Court.*  You don't scare me at all.

*Defendant.*  You don't scare me.

*The Court.*  So, why don't you do this --

*Defendant.*  You don't scare me.

*The Court.*  -- when you're sitting in prison put a checkbox on everyday that you serve, and put Xs and count your time, cause you finda [sic] do all these days.  You had a fair trial, the record will speak that --

*Defendant.*  I never had a fair trial.

*The Court.*  Well, of course --

*Defendant.*  I never had a fair trial.

*The Court.*  -- you don't believe you had a fair trial, because you thought that you would hoodwink and bambozzle [sic] this jury --

*Defendant.*  I never had a fair trial.

*The Court.*  -- by convincing that little boy to come here and lie for you, but enjoy your time that you're about to spend in Michigan Department of Corrections.  And when you get out, you ain't goin' [sic] do nothing, do the same stuff and go right back.  If I could give you more time, I would.

*Defendant.*  And I know you would --

*The Court.*  So, here's the situation you will be serving --

*Defendant.*  I know you would, do what you do.

*The Court.*  Oh, I will.

*Defendant.*  Yeah, do what you do.

*The Court.*   Does this make you feel like a man?

10

*Defendant*.  You don't scare me.

*The Court*.  I'm not trying to scare you.

*Defendant*.  You don't scare me period, do what you goin'[sic] do.

*The Court*.  I'm not trying to scare you.

*Defendant*. Do what -- stop talking to me then, do what you goin' [sic] do.

*The Court*.  You can't tell me what to do, why don't you just take him in the back and we'll finish the sentence without him.  Goodbye, Clown.

*Defendant*.  Fuck you.

*The Court*.  Oh, you wish you could.

*Defendant*.  Clown [sic] with yoe' [sic] hood rat ass.

*The Court*. You wish you could.

*Defendant*.  Hood rat.

*The Court*. I threatened his mother.  I didn't threaten his mother.  But oh, well, it's everybody's fault but his own.

So it will be the sentence of this Court -- for the record, the defendant has been removed because his foul and abusive language, and I'm sure the court reporter caught as he leaving he said fuck you, f-u-c-k-y -- I mean f-u-c-k y-o-u, and then I think he called me a hood rat or something which I'll take as a complement.

So anyway, I will sentence him to the top of the guidelines which is 46 months, that's 3.833 years for his offence of felony firearm to I think he gets -- [Emphasis added.]

After Walker indicated several times that he had no more to say and asked the court to "[d]o what you goin' do," Judge Lillard continued to bait him in an utterly childish fashion.  For reasons known only to Judge Lillard, Walker's repeated statement that he was "thew [sic] talking" sounded like a "threat" to Judge Lillard.  She responded by calling Walker a "clown," and the hearing went downhill from there.  In my view, Judge Lillard's decision to sentence Walker to the top of the guidelines' range likely was a product of emotion rather than reason.

11

The lengthy exchange of insults—precipitated by the judge—deprives me of confidence in the integrity of Judge Lillard's sentencing decision. This is a tainted sentence that requires reconsideration before an impartial jurist.


/s/ Elizabeth L. Gleicher