785 A.2d 440 (2001)
345 N.J. Super. 382
STATE of New Jersey, Plaintiff-Respondent,
v.
Lisa DIFERDINANDO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 22, 2001.
Decided November 29, 2001.
*441 Peter A. Garcia, Acting Public Defender, attorney for appellant (Jodi L. Ferguson, Assistant Deputy Public Defender, of counsel and on the brief).
Ronald S. Fava, Passaic County Prosecutor, attorney for respondent (Gary H. Schlyen, Chief Assistant Prosecutor, of counsel and on the brief).
Before Judges BRAITHWAITE, COBURN and WEISSBARD.
The opinion of the court was delivered by BRAITHWAITE, J.A.D.
Following a jury trial, defendant Lisa DiFerdinando was convicted of possession of cocaine, N.J.S.A. 2C:35-10a(1); third degree aggravated assault, N.J.S.A. 2C:12-1b(2); two counts of second degree eluding, N.J.S.A. 2C:29-2b; and the disorderly persons offense of resisting arrest, N.J.S.A. 2C:29-2a(1), a lesser offense of fourth degree resisting arrest. At sentencing, the trial judge merged one of the eluding convictions with the other and imposed an eight-year custodial term with a two-year parole bar on the surviving conviction. Concurrent five-year custodial terms, with two years of parole ineligibility were imposed on the possession of cocaine and aggravated assault convictions, and a six-month concurrent term was imposed on the resisting arrest conviction.
Defendant now appeals and contends:
POINT I
THE TRIAL JUDGE COERCED A VERDICT BY FAILING TO EXPLAIN TO THE POTENTIALLY DEADLOCKED JURORS THE CONSEQUENCES OF BEING ABLE TO ARRIVE AT A UNANIMOUS VOTE, AND THEN BY SETTING A DEADLINE FOR THE JURY TO REACH A VERDICT AFTER THEY HAD BEEN DELIBERATING FOR ELEVEN DAYS.
A. The Court Erred by Failing to Provide Instructions to the Potentially Deadlocked Jury. (Not Raised Below)
B. The Court's Decision to Set a Time Limit for the Jury's Verdict Was Unduly Coercive.
POINT II
THE TRIAL COURT'S FAILURE TO DEFINE THE TERM ATTEMPT TO THE JURY DURING HER INSTRUCTIONS ON SECOND AND THIRD *442 DEGREE ELUDING DENIED DEFENDANT A FAIR TRIAL AND DUE PROCESS OF LAW, AND HER CONVICTION MUST THUS BE REVERSED. (Not Raised Below)
POINT III
DEFENDANT'S CONVICTION FOR POSSESSION OF A CONTROLLED DANGEROUS SUBSTANCE WAS AGAINST THE WEIGHT OF THE EVIDENCE.
POINT IV
DEFENDANT'S SENTENCE IS EXCESSIVE.
We reject these contentions and now affirm.

I
The State produced the following evidence at trial. On February 13, 1997, Passaic County Sheriff's Officer Leonard Arcieri and his partner, Nick Casasanta, were on fugitive writ duty in Paterson. They were in plain clothes and in an unmarked car and were to apprehend persons sought on fugitive arrest warrants. Shortly after 4:00 p.m., the officers were on East 23rd Street when they observed a female, later identified as defendant, and a man talking on the corner approximately thirty feet from the officers. Defendant appeared to be a fugitive wanted on a warrant, one "Antonette Malavarca." Arcieri then witnessed the male hand something to defendant which appeared to be small square objects.
After receiving the items, defendant got into the driver's seat of a black car parked at the corner of the intersection. Anthony Spino was a passenger in the car. The car, originally believed to be a Pontiac Firebird, turned out to be a Chevrolet Camaro, a car similar in design to a Firebird. Defendant drove off and Arcieri and Casasanta followed to determine if defendant was the subject of the fugitive warrant.
After proceeding about a block and a half, defendant stopped at a red light on 11th Avenue and Madison, whereupon the undercover police car came up alongside defendant. Arcieri, driving the car, was alongside the passenger side of defendant's car, about five feet or less from defendant. The detective looked over to see defendant holding something in her right hand, against her stomach. It appeared she had small plastic baggies consistent with cocaine packages with which the officer was familiar from over four years experience on the narcotics squad. The passenger, Spino, was also looking in the direction of defendant's lap.
Arcieri then knocked on the Camaro's passenger side window, displaying the badge which hung on a chain around his neck. He advised defendant to shut off the car. Rather than complying, defendant drove out of the traffic lane, over a double yellow line and went around the car in front that was waiting at the red light. At that point, Arcieri activated the police lights and siren and followed defendant as she sped through several red lights and stop signs. Arcieri testified that there was heavy traffic in the area and defendant was traveling at a high rate of speed. After the detectives lost sight of defendant, they notified headquarters that the vehicle may be entering Route 80.
At that time, Sheriff's Department Detectives Raymond Mankovich and Kevin Huha were in the area of Route 80 in Totowa and were also in plain clothes and in an unmarked vehicle. They heard the radio transmission in which Arcieri related being involved in the pursuit of a black Firebird (or Camaro) that was possibly now on Route 80. They drove to the Union Boulevard overpass over Route 80, where Mankovich exited to scan the traffic *443 in the westbound lanes. Mankovich spotted defendant's car weaving in and out of traffic at a much higher speed than the flow of other traffic.
The Camaro left Route 80 at the northbound Union Boulevard exit ramp near the detectives and they immediately followed the car. They stayed behind the car without lights or sirens in order to see if it was the vehicle in question. Defendant drove down a driveway in a retail shop parking lot toward the rear of the building. Mankovich and Huha followed and spotted the car in the rear parking area approximately twenty-five yards away facing the driveway entrance. Upon receiving confirmation from headquarters on the description and plate number, Huha activated the emergency lights.
Mankovich had started to exit the police vehicle when defendant observed the detectives' vehicle and accelerated head-on toward the officers. As Huha swerved to avoid a collision, defendant drove past the detectives' vehicle and went back up the driveway to turn onto Union Boulevard southbound. The officers went in pursuit using the flashing head lights, the emergency light on the dashboard and the siren. Defendant's vehicle was in the right lane and was attempting to get through the traffic to the left-turn lane. Huha pulled the police vehicle into the left lane as well and blocked defendant's vehicle at a slight angle by cutting to the right in front of her vehicle.
Mankovich exited his vehicle. With his badge hanging from his neck chain and his hand on his firearm, he yelled at defendant to shut off the car and exit her vehicle. Suddenly, defendant backed up and then drove forward toward him. As the car came forward, Mankovich was struck by the left front quarter panel of the car. Meanwhile, Huha had also exited the police vehicle. He was at the rear of the Camaro when it first went into reverse. Anticipating further pursuit, Huha started to go back to the police car. He then heard the screech of the tires, Mankovich yell, and "a popping sound" as defendant's driver side window broke. Huha observed Mankovich partially inside the Camaro's driver side window, fighting with defendant. It was later determined that the popping noise was caused by the breaking of the driver's window by some part of Mankovich's body as he was hit by the vehicle. Mankovich had attempted to get to the gear shift lever while screaming at defendant to shut off the vehicle. At the same time, he heard the engine revving loudly and screamed "get your foot off the gas," while battling defendant for the gear shift.
The Camaro finally went into neutral and came to rest with a "light tap" on the police car. Mankovich began battling with defendant. He ultimately grabbed her hair and pulled her out of the Camaro through the window. She was pushed up against the Camaro and told to put her hands on the roof. Defendant continually removed her hands from the roof of the car. Mankovich had to use his left hip to keep her against the vehicle as he put his firearm back into his holster. Once he replaced his gun, Mankovich handcuffed defendant. Huha had gone back around the Camaro to cover the male passenger, Spino. Prior to Huha handcuffing the passenger, Mankovich saw them speaking. Telling defendant not to move, Mankovich went to ask Huha why he had not yet handcuffed and removed Spino from the car. Huha advised him that Spino reported having recently had heart surgery. Mankovich directed Spino to exit the vehicle and then he was handcuffed by Huha.
Arcieri and his partner eventually arrived on the scene and identified defendant, the passenger, and the car as the *444 parties and vehicle involved in the earlier chase. As Arcieri stood near defendant's vehicle with Huha, Huha observed "some white objects" in the area of the vehicle where the roof line ends and the glass hatch begins. Huha removed three small zip-lock baggies containing a white substance that tested positive for cocaine.
Mankovich's knees began to ache after his return to the police station. He discovered his legs were bloody and injured from the knees to the ankles. X-rays did not reveal a fracture, but he was told to see a physician and not to return to work. Subsequently, the pain continued and he had two surgeries on his legs with the condition ultimately stabilizing. He now has problems, however, with steep stairs and on loose surfaces such as sand at the beach. Further, he stated he has been rendered unable to run.
The defense was premised on denying defendant had engaged in any drug transaction, any reckless driving or any attempt to elude the police. Defendant maintained that she was only trying to get away from the suspicious vehicle that was following her and that she was unaware it contained sheriff's detectives. Spino testified that he and defendant went to the Paramus Mall on Route 17 where defendant shopped while he stayed in the car or walked about the parking lot. He testified that they left the mall via Route 80 where defendant became stuck in traffic and got off the highway because she knew a short cut. Defendant also needed gas and cigarettes, so they stopped at a gasoline station. He stated that shortly thereafter they were stopped at a traffic light when a car pulled up along the right and an occupant of that car seemed to be yelling to pull over. Spino testified that upon informing defendant of this, the light changed and she "took off." He denied ever being aware that either vehicle contained sheriff officers.
According to Spino, Mankovich jumped out of his car with gun drawn, ran around the front of the Camaro and bumped into the fender. Spino testified that defendant was calmly complying with Mankovich's directives, but that the detective kept yelling and finally just smashed the window. Spino denied being aware of any drugs in the car, denied defendant purchased drugs in Paterson, and also denied defendant fought with the officer prior to being taken out of the vehicle.
Based on the above, defendant was convicted of the charges previously noted. This appeal followed.

II
Relevant to the issues raised by defendant in point one, is the time frame involved during the jury deliberations. Deliberations began on May 18, 1999, at 3:16 p.m. and went until 4:00 p.m. Day two was May 19, 1999, and deliberations lasted most of the day with a read back consuming about half an hour. Day three was May 20, 1999, and the jury arrived after 12:00 p.m. and a requested read back consumed most of the afternoon with approximately fifteen minutes of deliberation before the jury recessed. Day four, May 21, 1999, was a full day of deliberations. Day five began with a response to a jury note and deliberations began at 9:57 a.m. The jury then asked for a read back of Huha's testimony and reinstruction. The reinstruction was given in the afternoon and the jury was excused for the day at 2:45 p.m.
May 25, 1999, day six, began with the read back and deliberations commenced at 10:22 a.m. The jury recessed at about 4:00 p.m. Day seven, May 26, 1999, was a full day of deliberations. Day eight, May 28, 1999, began at 9:22 a.m. with a requested *445 reinstruction on the burden of proof given during the morning, and the jury recessed for the day, at its request, at 2:05 p.m. Day nine, June 1, 1999, began at 11:11 a.m. with a note sent out by the jury at 11:50 a.m. The judge responded to the note by giving a modified Allen[1] charge. Deliberations resumed at 12:27 p.m. and ended for the day at 3:11 p.m. Day ten, June 2, 1999, commenced at 9:55 a.m. and concluded about 3:15 p.m. At the start of day eleven, June 3, 1999, the jury had spent approximately seven days and two-and-a-half hours deliberating. June 3, 1999, the eleventh calendar day of deliberations, began at 10:20 a.m. after an instruction from the judge. The jury had a question at 11:30 a.m. that indicated it was close to a verdict on all counts but needed reinstruction on the definition of attempt. The instruction was given and the jury resumed deliberating at 12:16 p.m. A verdict was reached at 12:30 p.m.
As a corollary, the length of the trial bears mention. On May 11, 1999, the jury was empaneled, given standard legal instructions and allowed to leave. May 12 and 13, 1999, included opening statements and then full days of testimony. May 14, 1999, was a half day with the jury excused at 12:30 p.m. On May 17, 1999, testimony resumed at 10:00 a.m. and went until late afternoon when all trial testimony was completed. May 18, 1999, began at 10:00 a.m. and included the closing arguments and the jury charge. The jury received the case at 3:16 p.m. All in all, the trial consumed approximately four days.
Defendant contends that the length of the deliberations was excessive and that this was a sure sign that the jury was having difficulty reaching a verdict. Further, defendant asserts that the judge's failure to give guidance to the "struggling" jury at the first sign of difficulty, denied defendant a fair trial.
Specifically, defendant contends that on the fifth day of deliberations, a note, sent out by one juror to the judge, clearly indicated that the jury was struggling with a verdict and that the judge was bound to give the instruction mandated in State v. Czachor, 82 N.J. 392, 413 A.2d 593 (1980). Defendant argues that the failure to give the Czachor charge was plain error meriting reversal and a remand for a new trial. Defendant, however, failed to raise this point before the trial judge. In fact, defense counsel specifically agreed with the judge's resolution of the juror's note.
The note sent out from Juror 13 stated:
Honorable Judge Clark: When I was assigned and sworn into this case, I gave my word to do my best and do my part to the best of my ability. That has never changed. It remains paramount in my mind. Because of this fact, I have (2) questions about court procedures which apply to any and "any" is circled, "any criminal case." And underlines "criminal."
Number one. With the eight counts in this case, if? and he underlines "if" with a question mark, if the jury cannot agree [unanimously] in say one or two of the counts, does this constitute a `hung' jury? Or, is it possible to be partially `hung' on a couple of the counts?
Two. What are the times when it is legal to utilize an alternate juror relevant to (avoiding) a so-called `hung' jury. Or are the alternate and a hung jury mutually exclusive subjects/events?
If you think it necessary, can you please discuss these questions with the two lawyers and, at your discretion, read what could/should be read for the record, if any part of this.
*446 The judge discussed the question with both attorneys and stated: "[t]he juror is not saying we are hung, the juror is saying what happens if we are hung, so I don't think it is a situation where I start reading them the Allen charge."[2] (emphasis added.) The judge went on to say that she would answer the question in "strict legal terms as he has asked," i.e., verdicts on some counts but not on other ones are acceptable and use of the alternate would be inappropriate.
Rule 1:7-2 states that in order to preserve questions for review, at the time a ruling or order is made, a party must make known to the court his objection to the action taken and grounds therefor. Defendant not only did not object, but concurred, agreeing that the note did not reflect a deadlocked jury. Despite that, we review defendant's claim under the plain error standard. Under Rule 2:10-2, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result."
The Czachor Court developed guidelines for trial judges in the event of jury deadlock in criminal cases. 82 N.J. at 404, 413 A.2d 593. The opinion directed that in situations where the jury has been unable to reach unanimous verdicts, the court should instruct the jury in accordance with ABA Standards § 5.4. Id. at 407, 413 A.2d 593. The instruction should be given in the initial charge, which the judge did, here, and repeated at the judge's discretion. Ibid. The judge's discretion should be guided by "such factors as the length and complexity of trial and the quality and duration of the jury's deliberations." Ibid.
There was clearly no obligation to give the Czachor charge when the juror sent the note. While defendant points to the fact that it was the fifth day of deliberations, the reality is that only May 19 and 21, 1999, were full days, while May 18, 1999, consisted of barely forty-five minutes of deliberation and May 20, 1999, consisted of approximately three-and-a-half hours of the read back of testimony and only fifteen minutes of deliberations. The note referred to above was received and responded to on May 24, 1999, before any deliberations began. In essence, the jury had only deliberated two days and approximately one hour at that point. Furthermore, the note did not express actual deadlock or inability to agree on any of the charges. The note merely sought clarification on the ability of the jury to return a verdict on some, but not all of the charges if that circumstance became a reality.
Here, there was no report of a "definite deadlock after a reasonable period of deliberations." Czachor, 82 N.J. at 407, 413 A.2d 593. Assuming, arguendo, that the judge contemplated the need for an instruction applying the factors mentioned in Czachor, the record supports her decision not to give it. While the trial was not complex, it spanned six calendar days, with approximately four days worth of actual trial. Up to that point, the jury had deliberated one full day; reheard the testimony of the State's main witness, Arcieri, and defendant's main witness, Spino, at their request; and then deliberated another day. The note came at the outset of the next day. The jury was obviously actively considering key components of each side's case. The judge acted well within her *447 discretion in not instructing the jury in accordance with Czachor.
Defendant also argues that at that same "critical moment," the judge failed to properly advise the jury when it appeared that it may have reached a partial verdict. Defendant relies upon State v. Shomo, 129 N.J. 248, 609 A.2d 394 (1992), as support for this proposition.
Shomo addressed the circumstance where a jury announced its verdict on the first two of four charges under consideration without being instructed on the finality of the partial verdicts. After hearing the partial verdicts, the court gave a modified Czachor charge and released the jury for the evening. Id. at 252, 609 A.2d 394. The next day, the judge received several notes. The first asked about guilt by admission and the second relayed that the jury was not going to reach a unanimous verdict on the remaining counts and asked "what is our next step?" Ibid. The judge also received a note from a juror indicating a desire to "change" his vote on the first count. Id. at 253, 609 A.2d 394. Our Supreme Court held that before a court receives a partial verdict, it should unambiguously instruct the jury that a partial verdict will be considered final, not subject to reconsideration, even though the jury continues to deliberate on other counts. Id. at 258, 609 A.2d 394.
Here, defendant's reliance on Shomo is misplaced. The note on May 24, 1999, did not declare a final resolution to any of the counts, nor did it declare a present inability of the jury to reach a unanimous verdict. Furthermore, it did not ask the judge for guidance as to what step it should take next due to a deadlock. The note simply asked what exactly a "hung" jury was and whether there was such a thing as being "partially hung." Thus, Shomo is distinguishable and no instruction on finality of partial verdicts was necessary here.

III
Next, we address defendant's claim that the judge gave an instruction that coerced the guilty verdicts on May 28, 1999, when the jury sought additional instruction on burden of proof. The judge discussed answering the question with the attorneys and neither party urged the judge to give the Czachor charge at that time. Later in the day, the judge noted the length of the deliberations. While recognizing that there must be some disagreement between jurors, she stated, "I do not detect that the jury is tremendously tense or doesn't want to [come] back." She further noted:
At this point if they told me they were hung on one or more counts, I very probably would not tell them to make any further deliberations after this length.... I would probably not give them an Allen charge or anything of that nature after this type of effort.
I just don't know that it is appropriate for me to say anything to them. I can honestly say I never had deliberations of this length, particularly on a case that took essentially two or two and a half days of testimony, but I'm just not at the point where I'm ready to say anything to them.
The prosecutor agreed with the judge and defense counsel stated, "it would appear that they know what a hung jury is. For whatever reason, they are somewhere between no verdict, and verdict, and hung." The jury then requested to recess for the day. The judge stated that she did not want to put pressure on the jury. She noted, however, that the jurors asked to come back, "so at least in their minds it appears they think that they will reach verdicts." The judge obviously took this *448 as a positive sign that the jury was making progress.
The jury resumed deliberations on June 1, 1999. Shortly after deliberations began, the judge received a note to the effect that further consideration on four unresolved counts could lead to a change of votes on the resolved counts. At this point, the judge gave the modified Allen charge with the agreement of counsel.
At the end of the day on June 2, 1999, defendant made a motion for a mistrial based upon the length of deliberations. The judge reserved judgment until the following day, but noted that she was very "disinclined to declare a mistrial before I try saying something to them and then giving it another half day or whatever." She instructed counsel to think about her instructing the jury the following day.
On June 3, 1999, the judge denied the motion for a mistrial on the basis that there had not yet been any formal communication that the jury was deadlocked. She opted to give the modified Allen charge again and stated to the jury:
Ladies and gentlemen, I believe that there comes a point when the judge, who is not only the judge of the law, but, in effect, the supervisor or manager of the trial, should indicate that deliberations should come to an end. No Court would ever do this lightly, but I think given the length of deliberations that I should raise this issue with you.
Ladies and gentlemen, I have decided to indicate to you that as of three p.m. today, if you are still deliberating, I will call you out and I'll ask your forelady, as your representative, whether she believes that any further deliberations will result in a verdict on one or more counts. If she says no, then I will declare a mistrial, in effect, a hung jury. If she says yes, then I will allow some additional period of deliberations, and I'll make up my mind as to how long if I reach that situation.
Ladies and gentlemen, I stress to you that these remarks are not intended in any way to inappropriately pressure the jury to reach consensus on any count if you cannot do so, it is simply a recognition that deliberations have been lengthy and that placing reasonable limitations on deliberations is appropriate.
Defendant asserts that these remarks improperly pressured the jury into returning guilty verdicts. Defendant claims that the statement was so coercive that the jury could not have possibly felt that they were permitted to "deliberate objectively, freely, and with an untrammeled mind." Czachor, 82 N.J. at 402, 413 A.2d 593.
At the outset, we note that we have been unable to find a case that addresses what the trial judge should do in a situation like this. This is a rather uncomplicated case, essentially involving credibility. There was no statement from the jury that it was deadlocked, yet it was out deliberating over eleven calendar days. Several cases discuss when a directive to the jury is or is not appropriate in the context of the court receiving word from the jury that it is deadlocked. We now address those cases.
In State v. Nelson, 304 N.J.Super. 561, 701 A.2d 726 (App.Div.1997), the trial judge received a note that the jury was deadlocked. Id. at 563, 701 A.2d 726. We held that while it was appropriate for the judge to send the jury back out to deliberate, imposition of a forty-five minute deadline before the judge would declare a mistrial, and then delivery of a verdict within that time frame clearly was coercive. Id. at 566, 701 A.2d 726.
Here, however, the judge's supplemental instruction informed the jury that at 3:00 p.m. she would inquire whether further deliberations would be helpful. *449 She did not in any way imply that 3:00 p.m. was a deadline for the final verdict. In fact, she stated that further deliberation would be allowed if the jury so desired.
In State v. Ramseur, 106 N.J. 123, 524 A.2d 188 (1987), the Court held that the trial judge did not abuse its discretion in concluding that a note indicating deadlock, but asking for suggestions "clearly indicated the jury did not regard itself as deadlocked." Id. at 302, 524 A.2d 188. The Court added that "perhaps the trial court should have explored with the jury whether it had deliberated sufficiently and had reached a genuine stalemate, a point at which any further deliberations would have been counterproductive." Id. at 304, 524 A.2d 188.
Here, there was no deadlock note. The Ramseur language, however, provides support for the trial judge's remarks. Considering the length of the jury's deliberations, the judge told the jury that she would explore with it in approximately five hours whether further deliberation would result in verdicts, or whether further deliberation would be counterproductive. Her comments were consistent with the language in Ramseur and appropriate considering the judge's role in a jury trial.
Defendant argues that the judge should have been careful in her exercise of the power of comment, State v. Jones, 104 N.J.Super. 57, 62, 248 A.2d 554 (App.Div. 1968), certif. denied, 53 N.J. 354, 250 A.2d 755 (1969), and avoided "tip[ping] the scale" against the accused by commenting. State v. Corbo, 32 N.J. 273, 276, 160 A.2d 625 (1960). We conclude that the judge's remarks were carefully calculated to protect the sanctity of the deliberations that had occurred up to that point and did not amount to a "coercive time limit" as defendant purports.
In State v. Childs, 204 N.J.Super. 639, 499 A.2d 1041, certif. denied, 104 N.J. 430, 517 A.2d 423 (1985), we noted that any suggestion that the jury was coerced into reaching a verdict after being returned by the judge to deliberate was rebutted by the fact that the jury deliberated for four hours before it reached a verdict that could be regarded as favorable to defendant. Id. at 648, 499 A.2d 1041. Here, the same observation can be made. After the instruction was given, the jury continued to deliberate for approximately an hour and a half; asked for reinstruction on attempt; and then deliberated for about twenty more minutes before returning verdicts, some of which were favorable to defendant. Thus, the verdicts demonstrate an absence of judicial coercion as in Childs.
In State v. Harris, 156 N.J. 122, 716 A.2d 458 (1998), cert. denied, ___ U.S. ____, 121 S.Ct. 2204, 149 L.Ed.2d 1034 (2001), the Court held that the trial court did not coerce the minority of jurors into accepting the majority's position after sending them back to deliberate more upon receipt of a deadlock note. Id. at 184, 716 A.2d 458. The Court expressly noted that the supplemental instruction clearly instructed the jurors not to change their opinions simply to agree with other jurors or to "surrender a view honestly held." Ibid.
Here, the judge gave the jury essentially the same instruction. The judge said in part: "but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning verdicts." We cannot conclude that the judge's remarks coerced a jury verdict. No error "clearly capable of producing an unjust result" occurred. R. 2:10-2.

IV
In point two, defendant asserts that her convictions for eluding should be *450 reversed because during the instructions on the eluding charge, the judge did not define the word attempt as used in the eluding statute. Defendant did not object before the trial judge and therefore we must conclude that the judge's failure in this regard was of no moment, and not "clearly capable of producing an unjust result." R. 2:10-2. The judge advised the jury of the definition of "attempt" in connection with the instructions on aggravated assault. We are satisfied that the jury could have inferred that the same definition applied to the eluding counts as well. Considering the circumstances of this case, no reversible error occurred in this regard. See State v. Jordan, 147 N.J. 409, 422, 688 A.2d 97 (1997).

V
Next, defendant asserts that her conviction for possession of cocaine was against the weight of the evidence. Defendant's claim is barred procedurally because no motion for a new trial on this ground was made in the trial court. R. 2:10-1.
In addition to being barred procedurally, the claim lacks substantive merit. The record reflects ample evidence for the jury to find defendant guilty beyond a reasonable doubt of possession of cocaine. The jury is free to accept or reject, in whole or in part, any aspect of testimonial evidence based on credibility. State v. Coleman, 46 N.J. 16, 43, 214 A.2d 393 (1965), cert. denied, 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966). Here, the jury obviously believed the State's witnesses.

VI
Finally, defendant asserts that her sentence is excessive. We conclude that the findings of fact regarding aggravating and mitigating factors were based on competent and credible evidence in the record; that the judge did not apply incorrectly the sentencing guidelines enunciated in the Code; and that in applying the facts to the law, the judge reached a conclusion that could have been made upon a weighing of the relevant factors. State v. O'Donnell, 117 N.J. 210, 215, 564 A.2d 1202 (1989); State v. Ghertler, 114 N.J. 383, 387-88, 555 A.2d 553 (1989); State v. Roth, 95 N.J. 334, 365-66, 471 A.2d 370 (1984).
Affirmed.
NOTES
[1] Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).
[2] The New Jersey Supreme Court specifically rejected Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), in its holding in State v. Czachor, 82 N.J. 392, 413 A.2d 593 (1980) where it delineated new model guidelines. While using the new guidelines, the judge continued to refer to them under the old case name.