**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5937-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

THOMAS WEIR,

    Defendant-Appellant.

_____

Argued December 19, 2019 – Decided May 12, 2020

Before Judges Alvarez and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 14-04-0277.

Kalman Harris Geist argued the cause for appellant.

Ali Y. Ozbek, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Ali Y. Ozbek, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Thomas Weir of third-degree theft by deception,[1] N.J.S.A. 2C:20-4(a) (count one); third-degree money laundering, N.J.S.A. 2C:21-25(a)(b)(1) and (2) (count two); failure to pay New Jersey state income tax, N.J.S.A. 54:52-9 (count three); and filing a false New Jersey income tax return, N.J.S.A. 54:52-10 (count four).  On July 16, 2018, the trial judge imposed two and one-half years of probation on the theft by deception charge, to be served concurrently to equivalent terms of probation on counts three and four.  He also imposed, as required by statute, a consecutive two and one-half year term of probation on the money laundering conviction.  See N.J.S.A. 2C:21-27(c).  Finally, the judge imposed a $75,000 fine and $75,000 in restitution payable from defendant's 401k, after deducting $2500 already paid to the victim, for a total of $148,030 due within forty-five days.  We affirm.

Pre-trial, and during the trial, defendant moved to dismiss the indictment on the basis of alleged prejudicial errors; while testifying before the grand jury, the victim mentioned that the thefts stopped when defendant was briefly incarcerated, and resumed when he was released.  We more fully describe the exchange in the relevant sections. Defendant further argued that since the State

_____

[1]  The jury found the amount did not exceed $75,000.  The theft by deception and money laundering convictions were therefore in the third-degree range, not the second-degree range as charged in the indictment.

had not preserved access to text messages on his cell phone, which he claimed would have been exculpatory, dismissal was required. We detail the circumstances more fully below.

At trial, the victim, who began a stone fabrication and installation business in around 2002, testified he hired defendant to act as his bookkeeper/accountant. The two men had known each other for over thirty years. The victim had not completed high school, and was unfamiliar with the records that needed to be maintained for operational reasons and for the filing of tax returns. Thus, he hired defendant to work for him part-time to maintain the books.

As the years passed, defendant's responsibilities grew. He made bank deposits, answered phones, assisted customers, calculated and disbursed payroll, paid monthly bills, maintained business records, wrote all the business checks for the victim's signature, and prepared business tax returns. Only defendant had operated the company computer, which sat on his desk, and which the victim did not access until after his departure. In the morning, defendant would text the victim about the status of the business's bank account, and whether outstanding receivables needed to be collected so business bills could be paid.

The victim did not review his bank statements until 2013, shortly after he terminated defendant's services due to an unrelated disagreement. The victim

then realized that defendant had made frequent unauthorized payments to himself from the accounts, at times almost daily. These included transactions such as the purchase of $2470 worth of food from an upscale restaurant near the office, travel two or three times a year to the Dominican Republic, withdrawal of cash, and payment of incidental expenses while traveling. Defendant at one point obtained a cash advance using his own credit, and had the business reimburse him. Upon discovering the transactions, the victim filed a civil case against defendant, as well as against the business's bank, demanding $500,000 in damages, and lodged formal criminal charges against defendant.

Detective Tamara L. MacDonald of the Passaic County Prosecutor's Office's Financial Crimes Unit testified, offering her analysis of the business bank statements and other documents. Defendant maintained Chase credit card accounts with Continental Airlines, paid by electronic transfers from the business. Defendant made withdrawals from business funds to pay utilities at his second home in upstate New York, and gasoline expenses for his personal vehicle. He also bought candy and miscellaneous merchandise while on trips to New York City, in addition to making purchases at various retail outlets and restaurants with business funds. Defendant transferred funds from the company

account to his personal accounts from 2008 to 2013. MacDonald did not preserve the drafts of her final report.

Bruce Stuck, a supervisory special agent at the New Jersey Department of Treasury, Division of Taxation, Office of Criminal Investigation, also testified at trial. Defendant owed taxes on $194,029.14 in unreported income from 2008 to 2012. By the State's calculations, defendant transferred a total of $211,097.95 from the business to various accounts in his name between 2008 and 2013.

Defendant testified to the contrary. He claimed all electronic transfers were valid reimbursements for purchases he made for the business and for the victim personally. Defendant presented evidence of his purchase—using his own credit card—of a computer and printer on November 12, 2003, for which he was reimbursed, to establish a course of conduct. He also presented proof of a $3500 loan he had made to the victim in 2005. Defendant alleged the victim enjoyed a lavish lifestyle, funded through the business, and that the company was in dire financial straits because of the victim's excessive spending.

Defendant claimed that he constantly communicated with the victim, including daily text messages, and that the text messages would have supported his version of the facts. When his expert attempted to retrieve text messages from a cell phone the prosecutor's office had seized, the phone was locked.

5

Defendant said those text messages would have corroborated his testimony that all transfers and cash advances were authorized by the victim.

Defendant also claimed he logged each purchase in a green notebook, which contained a list of the expenditures, with dates, that would have further corroborated his testimony. He said he kept the notebook in the right bottom drawer of his desk at the office, but that when his attorney attempted to retrieve it, the victim denied it ever existed.

The victim did not dispute that at times he reimbursed defendant for purchases. He testified the expenses were minor, and the reimbursements all in cash. The sums never exceeded $100.

The prosecutor's cross-examination of defendant included questions about his previous employment with another company. He said "[d]idn't the principals get into trouble? Did you hear that?" Defense counsel objected, and the judge sustained the objection. He immediately instructed the jury that they must not include any portion of the testimony in their deliberations.

Defendant asked the judge to charge that unless the jury found defendant guilty of theft by deception, it had to acquit him of money laundering. The judge refused, as the offenses had different elements independent of each other. He instructed the jury in accord with model instructions. See Model Jury Charge

(Criminal), "Theft by Deception" (rev. Apr. 15, 2013); Model Jury Charge (Criminal), "Financial Facilitation of Criminal Activity" (approved Jan. 2019).

While deliberating, the jury asked the court, "[c]an the defendant be guilty of money laundering while be[ing] innocent of theft by deception?" In response, the judge reinstructed, again tracking the model charges, on theft by deception and money laundering. Defense counsel renewed his request that the jury be charged that money laundering and theft by deception were interdependent, which was denied.

Defense counsel further argued that the tax evasion count could not be considered by the jury if they acquitted defendant of theft by deception, and also requested that they be instructed accordingly. The judge denied this request as well.

After four days of deliberations, the jury sent a note asking "[w]hat if we cannot come to an agreement?" Some jurors indicated that continuing deliberations was difficult because they were no longer being paid. The judge asked the panel to serve an additional day and offered to call their employers.

Defense counsel moved for a mistrial on the basis that the jury was deadlocked. Because the hotly contested trial had spanned six days, the judge elected to give the model jury charge on further jury deliberations. See Model

7

<u>Jury Charges (Criminal)</u>, "Judge's Instructions on Further Jury Deliberations" (approved Jan. 2013).  The jury resumed deliberations and reached the verdict of guilty as to all counts on the same day.

At sentencing, the State contended the victim's losses totaled $211,097.95, the total transfers from the business bank accounts to defendant's various personal accounts.  In light of the jury finding that the theft did not exceed $75,000, crediting defendant for the $2500 payment he made in the civil suit, the judge capped the restitution figure at $72,500.

On appeal, defendant raises the following points of error:

> POINT I
> THE PROSECUTOR COMMITTED PROSECUTORIAL MISCONDUCT WHEN HE INSINUATED WITHOUT ANY GOOD FAITH BASIS WHATSOEVER THAT DEFENDANT HAD ENGAGED IN BAD ACTS IN A FORMER COMPANY WHERE HE HAD BEEN EMPLOYED AS THE COMPTROLLER AND WHERE THE PRINCIPALS GOT INTO TROUBLE SHORTLY AFTER HE HAD LEFT THE COMPANY.
>
> POINT II
> THE DEFENSE MOTION FOR A JUDGMENT OF ACQUITTAL REGARDING THE MONEY LAUNDERING COUNT SHOULD HAVE BEEN GRANTED BECAUSE THE MONEY LAUNDERING STATUTE REQUIRES TWO TRANSACTIONS INVOLVING ORGANIZED CRIMINAL ACTIVITY: THE UNDERLYING CRIMINAL ACTIVITY GENERATING THE PROPERTY AND THE USE OF

A-5937-17T4

THE ALLEGEDLY STOLEN FUNDS IN SOME TYPE OF LEGITIMATE BUSINESS ACTIVITY OR CRIMINAL ACTIVITY.

POINT III
THE JURY SHOULD HAVE BEEN INSTRUCTED THAT IT COULD NOT FIND DEFENDANT GUILTY OF MONEY LAUNDERING IF IT WERE TO ACQUIT DEFENDANT OF THEFT BY DECEPTION.

POINT IV
THE COURT SHOULD HAVE GRANTED THE DEFENSE MOTION FOR A JUDGMENT OF ACQUITTAL REGARDING THEFT BY DECEPTION BECAUSE THE STATE DID NOT ESTABLISH THAT A DECEPTION HAD TAKEN PLACE.

POINT V
THE TRIAL COURT SHOULD HAVE INSTRUCTED THE JURY THAT IT COULD NOT CONVICT DEFENDANT ON THE TAX CHARGES UNLESS IT FOUND THAT HE HAD COMMITTED THEFT BY DECEPTION.

POINT VI
THE TRIAL COURT FAILED TO DISMISS THE INDICTMENT DUE TO THE STATE'S FAILURE TO PROTECT AND PRESERVE THE EXCULPATORY EVIDENCE OF TEXT MESSAGES CONTAINED WITHIN DEFENDANT'S CELL PHONE.

POINT VII
THE TRIAL COURT DEPRIVED DEFENDANT OF A FAIR TRIAL BY FAILING TO PROVIDE AN ADVERSE INFERENCE CHARGE REGARDING THE STATE'S FAILURE TO PROVIDE ALL NOTES OR WRITINGS OF DETECTIVE MACDONALD.

 A-5937-17T4

POINT VIII
THE TRIAL COURT UNFAIRLY LIMITED THE
SCOPE OF CROSS-EXAMINATION REGARDING
THE CIVIL COMPLAINT WHICH HAD BEEN
FILED AGAINST DEFENDANT BY [the victim].

POINT IX
THE TRIAL COURT SHOULD HAVE GRANTED A
MISTRIAL WHEN THE JURY DECLARED IT WAS
DEADLOCKED.

POINT X
THE INDICTMENT SHOULD HAVE BEEN
DISMISSED DUE TO THE PREJUDICIAL
EVIDENCE BEFORE THE GRAND JURY THAT
DEFENDANT HAD OTHER CHARGES.

POINT XI
THE CUMULATIVE EFFECT OF THE ERRORS
COMMMITTED AT TRIAL REQUIRE REVERSAL
OF THE CONVICTION.

POINT XII
THE TRIAL COURT'S DECISION REGARDING
RESTITUTUION MUST BE REVERSED.

I.

Defendant contends that the trial judge should have declared a mistrial when the prosecutor asked him about problems experienced by the principals of the company that employed him before he went to work for this business. On appeal, like at trial, defendant theorizes that the question insinuated that the similar problems were caused by defendant, presenting the jury with prior bad

10                                                    A-5937-17T4

acts. We consider the question, which included no details, and was followed by a prompt, clear, and strongly worded curative instruction, to have not created such prejudice as to warrant a mistrial. The point does not require further discussion in a written decision. R. 2:11-3(e)(2).

II.

Defendant claims that his motion for acquittal should have been granted because the money laundering statute requires an underlying criminal activity generating the property at issue and the use of the improperly sourced funds in some type of legitimate business or criminal activity. Since there was no underlying predicate offense, defendant asserts the money laundering conviction should be overturned. Defendant's third point is that the jury should have been instructed that it could not find defendant guilty of money laundering if it were to acquit him of theft.

Defendant was found guilty of theft by deception, however. Thus, the actual premise for the argument is absent. Furthermore, neither the statute nor the cases following require the money involved in the "laundering" come from organized crime. The points do not warrant further discussion in a written opinion. R. 2:11-3(e)(2).

### III.

In his fourth argument, defendant contends that he should have been granted a judgment of acquittal because the State failed to prove beyond a reasonable doubt that a deception had taken place. He bases the weight-of-the-evidence argument on the notion that the victim did not know fraudulent transactions had occurred, defendant never misrepresented the business account balances, and he was not in any event guilty of any theft of any funds that he transferred from the business to himself, because they were owed as reimbursements.

The trial court correctly denied defendant's motion for acquittal because "a reasonable jury could find guilt . . . beyond a reasonable doubt" on the theft by deception charge. See State v. Sugar, 240 N.J. Super. 148, 152 (App. Div. 1990) (quoting State v. Reyes, 50 N.J. 454, 458-59 (1967)).

The statute for theft by deception states that "[a] person is guilty of theft if he purposely obtains property of another by deception." N.J.S.A. 2C:20-4. "Theft by deception 'occurs where one obtains the property of another by purposely creating a false impression.'" State v. Krueger, 241 N.J. Super. 244, 249 (App. Div. 1990) (quoting State v. Talley, 184 N.J. Super. 167, 169 (App. Div. 1982), rev'd on other grounds, 94 N.J. 385, 388 (1983)).

A-5937-17T4

Here, the State produced evidence that defendant's conduct met the elements of the crime through the testimony of the victim, MacDonald, and Stuck, and the admission of documentary evidence. The victim testified that from 2008 until 2013, he had no idea of, much less authorized, defendant's electronic transfers from the business account to his personal accounts—this is deception. The transfers purported to be legitimate payments made on behalf of the business.

The victim testified that he completely relied on defendant, never checking bank balances for himself until 2013. The victim, obviously, did not give defendant permission to use the funds for himself. The trial court did not err in refusing to grant defendant's motion for judgment of acquittal as to the theft by deception charge given the State's overwhelming proofs.

IV.

In his fifth point, defendant argues that the trial court should have instructed the jury that it could not convict defendant of tax fraud unless it found that he had committed a theft by deception. The jury did find that defendant was guilty of theft by deception, however. The point lacks sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

A-5937-17T4

V.

Defendant also claims that the trial judge should have dismissed the indictment because of the State's failure to preserve access to exculpatory material on his cell phone. He alleges the State exercised extreme negligence in failing to do so, and that had the State timely attempted to examine the phone, he would have been able to obtain copies of the messages.

The cell phone, seized in an unrelated sexual assault case before the victim knew the thefts had occurred, became locked with the passage of time. His cell phone provider did not keep text message records after a year. The judge denied defendant's motion to dismiss the indictment on this ground because any possible negligence on the State's part by not immediately examining the cell phone was irrelevant to the theft case.

Ultimately, the prosecutor and defense counsel stipulated as follows:

> The State had permission under a communications data warrant signed by a court to download data from [defendant]'s cell phone within ten days of the signing of the order. The State failed to do so. [Defendant] testified that [the victim] would send text messages to [defendant]'s cell phone to ask [defendant] to use [defendant]'s personal credit card to make purchases for both the [victim's] business and for [the victim] and his family with the cost to be repaid from the company bank account.

14

After you have considered all of the evidence in this case you may infer if you choose to do so, that if the State downloaded the data from [defendant]'s cell phone within the time permitted by the Court, and the text messages from [the victim] to [defendant] or vice versa appeared, they -- they would corroborate the testimony of [defendant] and contradict the testimony of [the victim] on this issue.

. . . .

Number one, [defendant]'s phone is currently in the possession of the Passaic County Prosecutor's Office which seized possession of the phone years ago. Two, the Passaic County Prosecutor's Office received permission from a court to examine the content of the phone within ten days. They did not do so. Three, subsequently, at the request of the defense attorney a defense retained technician was unable to open the phone and access its contents, and number four, the Passaic County Prosecutor's Office also attempted to open and access the contents of the phone and were unable -- or was unable to do so. This will go into the jury room with the evidence. Okay?

[(Emphasis added).]

As the judge observed, the parties' stipulation allowed the jury to infer, if convinced of defendant's credibility, that defendant's inaccessible text messages would have corroborated his testimony and contradicted that of the victim.

"The trial court's decision denying defendant's motion to dismiss [an] indictment is reviewed for abuse of discretion." State v. Saavedra, 222 N.J. 39, 55 (2015) (citing State v. Hogan, 144 N.J. 216, 229 (1996)). "On a motion to

15

dismiss a criminal indictment, the facts upon which the indictment is based must be viewed indulgently in favor of the State." State v. Fleishchman, 383 N.J. Super. 396, 398 (App. Div. 2006), aff'd, 189 N.J. 539 (2007). Furthermore, "every reasonable inference is to be given to the State." State v. Graham, 284 N.J. Super. 413, 416-17 (App. Div. 1995) (quoting State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 27 (1984)).

The judge's view of the State's actions seems eminently reasonable. Even if negligent, the State's failure to open the phone was too removed from this indictment, involving a totally unrelated charge, and occurring before these crimes were even discovered. Additionally, the stipulation would have allowed the jury to infer that had the messages been preserved, they would have corroborated his testimony. The judge did not abuse his discretion in denying the motion to dismiss the indictment.

## VI.

Defendant also contends he was deprived of a fair trial because the trial judge did not instruct the jury it could draw adverse inferences from MacDonald's failure to preserve her draft reports and notes. But the issue defendant developed at trial related only to draft reports—the detective said she had not kept copies of her drafts, only the final version of her report. From that,

counsel argues that an adverse inference charge should have been given to the jury, asserting that every iteration of the report should have been preserved.

The Supreme Court requires trial courts give an adverse inference charge at a defendant's request where the State violates the requirement that notes be preserved. State v. W.B., 205 N.J. 588, 608-09 (2011). W.B., however, relates to witness interview notes in particular, not draft reports. Id. at 608.

On cross-examination, defense counsel asked MacDonald if he could see her original notes and writings. She first told defense counsel she did not have any notes of her interview with the victim.

MacDonald explained that detectives "usually write [their] reports as [they] go along" and that they do not preserve each version of a report. Defense counsel said "[w]ell, what I want to see is the original report. The original writing that you made so we can see if the final writing is different." Afterward, defense counsel asked the court for an adverse inference charge based on the unavailability of MacDonald's "original report." The trial court declined. Since the discovery rules, and the case law interpreting those obligations, do not include draft reports, this argument lacks merit.

The point of W.B. is that the State must preserve interview notes, including interviews with a defendant, to ensure that a final report reflects what

17

was said by witnesses fully and accurately.  Draft reports do not fall in that category.  The State did not violate any discovery obligation and thus no adverse inference charge was necessary.

## VII.

Defendant further argues that the trial judge erred by limiting his cross-examination of the victim on the details of the civil suit.  The prosecutor had objected that the testimony was not relevant.  In the civil suit, the victim sought to recover $500,000, whereas the indictment alleged only that defendant had stolen $228,000.

The scope and content of cross-examination is "a matter resting in the broad discretion of the trial court." State v. Wakefield, 190 N.J. 397, 451 (2007) (quoting State v. Martini, 131 N.J. 176, 255 (1993)).  "[A]n appellate court will not interfere with such control unless clear error and prejudice are shown." Id. at 452 (quoting Martini, 131 N.J. at 263).

The judge pointed out that the two types of cases were entirely different, one being a civil action with a different standard of proof than a criminal action. Furthermore, allegations in a complaint are merely that, always subject to proof. Nonetheless, the court allowed defense counsel to ask the victim whether he believed defendant had ever forged a check and, when the victim said no,

challenge that response by having the victim read aloud his civil complaint alleging defendant forged checks.

We see no abuse in the judge's exercise of discretion. That the victim may have claimed a higher figure as damages in a civil case is not surprising. The record appropriately is devoid of information regarding how the thefts may have affected the business, an issue in a civil case not relevant to the actual amount defendant stole from the victim.

## VIII.

After four days of deliberation, the jury sent a note to the court asking, "[w]hat if we cannot come to an agreement?" A few jurors also indicated that continuing deliberations was difficult because they were no longer being paid. Defense counsel then moved for a mistrial. The court denied the motion.

On appeal, "[d]efendant submits a mistrial is in order because of the pressure placed upon the jurors to reach a verdict due to their own personal financial difficulties." Defendant also notes that "the jury deliberated four days in a three-day trial, in addition to having eleven days in recesses."[2] Defendant contends that the judge should have at least informed the jury that they could

---

[2] While defendant claims the trial only took three days, the transcripts indicate it took place over six days.

 A-5937-17T4

have failed to agree on a verdict, and that the lack of such an instruction prejudiced defendant.

The trial court correctly denied defendant's motion for a mistrial, because at that stage in deliberations there was no "obvious failure of justice." State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)).

In State v. DiFerdinando, 345 N.J. Super. 382, 390 (App. Div. 2001), for example, the jury deliberated for eleven days following a four-day trial involving financial records and a victim who took a hands-off approach to the operation of his own business. Id. at 391. On day five of deliberations, the jury sent a note to the trial court, asking what would happen if they could not arrive at a verdict as to some of the counts. Id. at 391-92. We decided that the note did not indicate that the jury was deadlocked, and that no instructions therefore had to be given for a deadlocked jury. Id. at 392-93. No mistrial was appropriate there—it would not be appropriate here.

In response to the jury's question, "[w]hat if we cannot come to an agreement?," the judge instructed the jury:

> It is your duty as jurors to consult with one another and to deliberate with the view to reaching an agreement if you can do so without violence to individual judgement. Each of you must decide the case for

yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the event -- in -- I'm sorry. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans. You are judges -- judges of the facts.

This language tracks the model charge on further jury deliberations. See Model Jury Charges (Criminal), "Judge's Instructions on Further Jury Deliberations" (approved Jan. 2013). There was no "obvious failure of justice" and the trial court correctly denied defendant's motion for a mistrial. Yough, 208 N.J. at 397.

IX.

During the victim's testimony before the grand jury, he said transfers from the business account to defendant's personal account stopped when defendant was incarcerated. As a result, a grand juror asked the assistant prosecutor presenting the matter as follows:

A Juror: The question was, was [defendant] incarcerated during the time that he was employed with his company?

[Assistant prosecutor]: [Defendant] may or may not have been incarcerated, you know, during the course of this time. But it's -- it's not relevant to the -- these current allegations. I mean does your question have anything to do with whether he was able to -- does it go

21

to these allegations at all or are you just curious about --

A Juror: All right. Bottom line is, basically, what I'm trying to establish in my own mind is if [defendant] if his job description [sic] included the wire transfer and that he went to jail during the time that he was employed with this guy how did it go on so long?

[Assistant prosecutor]: Okay. I understand. I thought maybe that's what you were asking. I'll call him back and we'll ask that question. Okay? But let me instruct you that whether or not he was incarcerated has -- I don't want you to be prejudiced against him –

A Juror: No, the charges, no.

[Assistant prosecutor]: Okay. All right. . . .

The assistant prosecutor brought the victim back. The prosecutor asked the juror's question:

Q: During the time when you had mentioned in passing that [defendant] was incarcerated --

A: Correct.
Q: -- is that correct? The question is these unauthorized transfers did not take place during the time the brief period when he was incarcerated?

A: Correct. For nine or ten days they stopped.

Q: Okay. And then --

A: They started the day after he was released.

Q: Okay.

Based on this exchange, defense counsel moved to dismiss the indictment. The judge denied the motion because the victim's grand jury testimony had probative value, was not unduly prejudicial, and the assistant prosecutor provided a curative instruction. The judge also declined to dismiss the indictment because "there was substantial evidence that was presented to the [g]rand [j]ury that would support the return of an indictment," and "an even-handed presentation" of the evidence that would allow the grand jury to objectively assess the charges.

The State presented the grand jury "with at least some evidence as to each element of the alleged crime[s]." See Fleischchman, 383 N.J. Super. at 399 (internal quotations omitted). Here, the juror's question regarding the electronic transfers and defendant's incarceration was of comparatively low prejudicial effect and high probative value. See N.J.R.E. 403; N.J.R.E. 404(b). Knowledge of whether the transfers continued through defendant's incarceration, when he could not make transfers from the account, would help the jurors assess whether defendant was responsible for them. Neither the prosecutor nor the victim elaborated on the nature of those charges or the outcome. Moreover, the assistant prosecutor explained that defendant may or may not have been incarcerated and that any previous incarceration was irrelevant to the current

23

charges. He told the jurors not to be prejudiced by the information. The information did not make the grand jury presentation improper. For this reason, the trial court did not abuse its discretion in denying the motion to dismiss the indictment. See State v. Del Fino, 100 N.J. 154, 165-66 (1985) (holding that absent any suggestion of a "fundamental taint of the grand jury process," the Court would not allow a challenge to the indictment after a defendant has already been convicted).

X.

Defendant also argues, pursuant to State v. Orecchio, 16 N.J. 125 (1954), that the cumulative effect of the alleged errors, even if none individually warrant reversal, together prejudiced defendant's right to a fair trial. We do not agree. There were no errors. Like in other cases, it was not a perfect trial, but it was a fair one. See State v. Weaver, 219 N.J. 131, 155 (2014) (quoting State v. Wakefield, 190 N.J. at 537 (2007)).

XI.

Finally, defendant argues that there was no basis for the trial court's restitution order, and that the order did not take into account defendant's ability to pay. "[I]n order for restitution to be imposed, an actual loss from defendant's actions must be demonstrated." State v. Martinez, 392 N.J. Super. 307, 318

24

(App. Div. 2007). "The amount and manner of payment of reasonable restitution is a matter for the judgment of the sentencing judge[.]" State v. Harris, 70 N.J. 586, 598 (1976).

"[T]he burden of proof remains on the prosecution, and the fact to be proved, the amount of the restitution, 'must be proved to the satisfaction of the court,' [N.J.S.A. 2C:1-13(d)(2)], by a preponderance of the evidence." Martinez, 392 N.J. Super. at 319 (quoting State v. Oliver, 298 N.J. Super. 538, 560 (Law Div. 1996)). "Due process is satisfied by affording the defendant a hearing on the amount of restitution, . . . and where there is a factual basis in the record to support the court's determination of the amount of restitution." Harris, 70 N.J. at 598-99.

Immediately before sentencing, the judge heard oral argument regarding restitution. He determined through the trial testimony and documentary evidence that the State established $211,097.95 had been transferred from the victim's bank account to defendant's various personal accounts. Because the jury as factfinder decided that the victim's loss was between $500 and $75,000, the court deducted the $2500 paid in the civil suit from a maximum of $75,000, leaving a remainder due of $72,500. Offsetting what he heard during the trial against the jury's top number, the judge arrived at a lawful restitution amount.

The judge also took into account defendant's ability to pay. Having been informed that defendant had a $300,000 401k plan, it was also reasonable to make restitution payable in full from defendant's 401k account.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5937-17T4